**MUSHROOM MAKERS, INC., Plaintiff,**

v.

**R. G. BARRY CORPORATION, Defendant.**

**No. 76 Civil 1589.**

United States District Court, S. D. New York.

Nov. 22, 1977.

**1222**

Watson, Leavenworth, Kelton & Taggart, New York City, for plaintiff; Leslie D. Taggart, Frank J. Colucci, Howard B. Barnaby, Jr., New York City, David A. Talman, Talamo, Phillips, Silver & Talman, Inc., Worcester, Mass., of counsel.

Watson, Cole, Grindle & Watson, Washington, D. C., Henry B. Roth, Herzfeld & Rubin, P. C., New York City, for defendant; Walter D. Ames, F. M. deRosa, Bernard L. Sweeney, Washington, D. C., of counsel.

### OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

The defendant, R. G. Barry Corporation ("Barry"), is the owner of the registered trademark MUSHROOMS, which it applies to women's shoes, sandals and slippers. The plaintiff, Mushroom Makers, Inc. ("Mushroom Makers"), commenced this action for a declaratory judgment that its use of the trademark MUSHROOM and the trade name Mushroom Makers in the promotion and sale of women's jeans, jackets, skirts and overalls, does not infringe Barry's registered trademark. Barry counterclaimed, charging plaintiff with trademark infringement, unfair competition and false designation of the origin of the plaintiff's goods.[1] At trial, Barry was deemed the lead-off litigant and presented its case first.

The respective products of the parties sold under the trademarks MUSHROOMS and MUSHROOM,[2] are separate and distinct. Plaintiff sells women's sportswear. It is not engaged in any business other than the sale of women's apparel. Defendant sells women's casual footwear. It is not engaged in any other business than the manufacture and sale of footwear.

The use of the trademarks with respect to the products sold by each is of rather recent origin. Defendant's use preceded that of plaintiff by a little more than one year. Defendant's initial shipments in interstate commerce occurred sometime in

---

1. Jurisdiction is grounded on the Trademark Laws of the United States, 15 U.S.C. § 1051, et seq., and the Judicial Code, 28 U.S.C. § 1338.

2. Plaintiff, in addition to the trademark MUSHROOM, uses the trade names Mushroom, Inc. and its corporate title Mushroom Makers. The parties agree that for the purposes of this action they may be treated as one. Plaintiff concedes that for all practical purposes its mark and defendant's may be deemed identical. (T.R. 373.)

1974.[3] The defendant's trademark MUSH-ROOMS was registered in the United States Patent and Trademark Office on February 4, 1975 and again on January 13, 1976. The registrations covered shoes, sandals and slippers.

The plaintiff first applied MUSHROOM on its women's sportswear in manufacturing samples in July 1975, and first used the trademark in interstate commerce in late October 1975. Mushroom Makers twice applied to the United States Patent and Trademark Office for registration of MUSHROOM, and each time was refused on the ground that the MUSHROOM mark was likely to cause confusion with Barry's mark.[4]

The defendant objected to the plaintiff's application for registration of the MUSHROOM mark on February 2, 1976. Plaintiff then commenced this action for a declaratory judgment that the products sold by it under the name MUSHROOM are entirely different from defendant's goods sold under the name MUSHROOMS and that no likelihood of confusion exists.

## DEFENDANT'S USE OF MUSHROOMS

R. G. Barry has been in business since about 1945 and has engaged in the manufacture of various products,[5] including a range of footwear. At present it manufactures and merchandises only footwear. In 1971, Barry began development of a line of casual footwear distinguished by a new foam rubber "Moleculair" sole. The fruits of this project were various styles of casual shoes, slippers, and sandals using the new sole design, which are sold under the trademark MUSHROOMS.[6] The mark, as already noted, is registered in the Patent Office in International Class 25, and applies to slippers, sandals and shoes.

In 1974, its first year of sale, Barry's Mushrooms Division sold 11,628 pairs of footwear at a total value of $75,400. Shipments increased considerably in 1975, topping one million dollars. They have reached almost two and a half million dollars for the first half of 1977. Net shipments of MUSHROOMS footwear since the inception of the product line total almost six million dollars.

To promote the sale of the casual footwear, Barry has spent over one million dollars in advertising.[7] Much of its advertising has been "cooperative," where Barry has shared the cost of promotion with the retail store in various locations throughout the country.[8] MUSHROOMS footwear is sold at over 2500 retail outlets, sixty per cent of which have participated in cooperative advertising. These advertisements have appeared in major newspapers. Barry has also undertaken $96,000 worth of television advertising of a local nature.[9] Barry

3. The evidence as to the date of the first use of the mark in interstate commerce is somewhat unclear. A former Barry employee testified that he transported a sample of MUSHROOMS shoes across state lines in late 1973 or early 1974, following which an order was received. Barry's application for registration of its mark stated that it was first used in interstate commerce on February 26, 1974; however, Barry submitted no evidence supporting that specific date. Other *Barry* evidence indicated that initial shipments, totalling $16,600, were made in June 1974 and no further shipments were made until December 1974.

4. The first application for MUSHROOM was filed on August 22, 1975. It was refused on March 29, 1976 by the Patent Office and subsequently abandoned. The second application was filed on May 26, 1976 and was refused five months later. This application was suspended pending the resolution of this action.

5. Barry began operations as a manufacturer of shoulder pads. In the past it also sold pillows, robes for men and women, seat covers, handbags and belts.

6. Barry attempted to start a men's footwear line based upon the same sole design, but apparently has abandoned the project.

7. The annual figures are as follows: 1974—$22,600; 1975—$326,900; 1976—$494,200; 1977 to date—$296,700.

8. Barry's share reaches 3% of the retailer's net purchases from Barry.

9. These advertisements were evidently placed after Barry had learned of plaintiff's use of MUSHROOM in connection with the sale of women's sportswear and after this action had been instituted.

has also sought to make its product known by including, with each pair of shoes sold to the retailers, a brochure containing information about MUSHROOMS' design and sole. It has further used "point-of-purchase" aids and "statement stuffers," which are provided to department stores and mailed out with the monthly bills.

Barry has been an active defender of its mark. It brought suit against a company selling "Mushsoles" shoes, which culminated in a consent decree wherein the defendant admitted infringement. When instances of alleged infringement of its mark have come to Barry's notice, it has asserted its right to priority. On July 14, 1975, Barry advertised in Women's Wear Daily and Footwear News (the major trade journal) that "Only R. G. Barry and Mother Nature can make MUSHROOMS."

## PLAINTIFF'S USE OF MUSHROOM

Plaintiff Mushroom Makers is one of a number of companies forming part of a clothing operation conducted by Stevens Sportswear, Inc. ("Stevens") of Worcester, Massachusetts.[10] Stevens had excess plant capacity at its manufacturing facility in Taylorsville, Mississippi, which it decided to devote to production of a misses sportswear line.[11] In June 1975 it enlisted the services of one Earle Sheldon to develop, style and sell the line. When preliminary tests proved production was feasible and samples of various items of the new line were prepared, Sheldon, in June or early July 1975, suggested to Stevens officials that MUSHROOM be used as the line's trade name and trademark. The origin of Sheldon's suggestion is discussed hereafter. Plaintiff first applied MUSHROOM, as already noted, on samples in July 1975, following which arrangements were made in August 1975 to offer a MUSHROOM line of women's sportswear to the trade. In September

1975, a showroom was opened in New York City and orders for MUSHROOM sportswear were taken. The first interstate shipments were made in October 1975.

Mushroom Makers' rapid growth and the commercial success of its MUSHROOM products are phenomenal. Sales of MUSHROOM apparel in its first full month of operation, November 1975, totalled $16,200. In 1976, monthly net sales ran from $224,000 to $1 million; net sales for the entire year equalled $6 million. For the first six months of 1977, Mushroom Makers has had net sales of $8.4 million. It is anticipated that sales will reach $20 million for all of 1977. This meteoric rise was accompanied by relatively small advertising expenditures. From the company's inception, it has spent only $174,000 on promotion. Much of plaintiff's success apparently has been the result of personal salesmanship and plaintiff's standing in the women's wear industry. In sharp contrast to Barry, Mushroom Makers has expended small sums for cooperative advertising. While it has placed advertisements in Cosmopolitan, the New York Times and Women's Wear Daily, many advertisements which refer to MUSHROOM apparel have been purchased by department stores such as Gimbels, May Cohen's, Winkelman's, Jordan Marsh and Marshall Field & Company.

## BARRY'S COUNTERCLAIMS

The basic issue in this case, however phrased, is whether Barry, the senior user whose trademark MUSHROOMS is applied to casual slippers, sandals and shoes, is entitled to protection against plaintiff, the junior user, whose trademark MUSHROOM is applied to women's sportswear, such as slacks, overalls, shirts, skirts and jackets made of denim, corduroy and other materials.

10. Stevens officials sought to incorporate a company under the name of Mushroom, Inc. in the State of Mississippi, but that name was unavailable; they subsequently caused the incorporation of Mushroom Makers, Inc. with its principal place of business in Taylorsville, Mississippi.

11. "Misses" sportswear refers to women's apparel directed at purchasers twenty years old and up. One of plaintiff's executives described the Mushroom Makers line as an "update misses line" in a "moderate to better" price range.

The touchstone of trademark infringement under the Lanham Act [12] upon which Barry seeks relief is "likelihood of confusion": whether a substantial number of ordinarily prudent purchasers are likely to be misled or confused as to the source of the different products.[13] As has often been observed, the law of trademark infringement is but part of the law of unfair competition [14] and the same test is applied with respect to each claim.

That the products are not identical does not foreclose relief to the senior owner if they are sufficiently related to make confusion likely.[15] On the other hand, the fact of seniority does not by itself entitle the first user to relief—the determination is to be made on the basis of "the equities involved," which requires an evaluation of the legitimate interests of the senior user, the junior user and the public consumer.[16] As most recently stated by the Second Circuit:

> The trademark laws protect three interests . . . : first, the senior user's interest in being able to enter a related field at some future time; second, his interest in protecting the good reputation

associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user; and third, the public's interest in not being misled by confusingly similar marks . . . .[17]

The senior user has the additional interest of preventing others from getting a free ride on the reputation and good will he has established [18]—from reaping a "harvest which others have sown."[19]

While earlier cases may have limited the circumstances under which a trademark owner was entitled to relief against a junior user of the mark on noncompetitive items,[20] more recent cases in this Circuit have expanded the factors which are to be evaluated in deciding whether the senior user is entitled to such protection. These include, but are not limited to:

> the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the

---

**12.** 15 U.S.C. § 1114.

**13.** *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 542 (2d Cir. 1956).

**14.** *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713 (1916).

**15.** *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167 (2d Cir. 1976) (women's scarves and apparel v. cosmetics and fragrances); *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245 (4th Cir.), *cert. denied,* 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 245 (1970) (communications services v. computers); *Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495 (2d Cir. 1962) (groceries v. real estate); *Pure Foods, Inc. v. Minute Maid Corp.*, 214 F.2d 792 (5th Cir.), *cert. denied,* 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 697 (1954) (juices v. meats); *Admiral Corp. v. Penco, Inc.*, 203 F.2d 517 (2d Cir. 1953) (televisions, radios, electric ranges and refrigerators v. sewing machines and vacuum cleaners); *Triangle Publications, Inc. v. Rohrlich*, 167 F.2d 969 (2d Cir. 1948) (magazines v. girdles); *S. C. Johnson & Son, Inc. v. Johnson*, 116 F.2d 427 (2d Cir. 1940) (waxes and floor cleaners v. fabric cleaners); *L. E. Waterman Co. v. Gordon*, 72 F.2d 272 (2d Cir. 1934) (fountain pens v. razor

blades); *Yale Elec. Corp. v. Robertson*, 26 F.2d 972 (2d Cir. 1928) (flashlights v. locks); *Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp.*, 350 F.Supp. 1341 (E.D.Pa.1972), *aff'd without opinion,* 480 F.2d 917 (3d Cir. 1973) (pipes and tobacco v. scotch whiskey).

**16.** *See Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 534 (2d Cir. 1964); 3 Callmann, The Law of Unfair Competition, Trade Marks and Monopolies, § 76.3(a), at 302 (3d ed. 1969).

**17.** *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1172 (2d Cir. 1976).

**18.** *Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928).

**19.** *Dwinell-Wright Co. v. White House Milk Co.*, 132 F.2d 822, 825 (2d Cir. 1943).

**20.** *See, e. g., S. C. Johnson & Son, Inc. v. Johnson*, 175 F.2d 176, 179–80 (2d Cir.), *cert. denied,* 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949). *See generally Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.*, 308 F.2d 196, 198–99 (2d Cir. 1962).

buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account.[21]

It has been emphasized that these factors are "variable and relative" and that no single one is determinative, but that all the pertinent factors must be considered, and upon a balancing of the conclusions reached on the pertinent factors, the determination is made as to whether relief is warranted.[22]

■ Against this background of the applicable law we consider the facts in appraising the equities urged by the parties in support of their respective positions. It may readily be acknowledged that the case is close. Indeed, the question of what protection a trademark owner is entitled to with respect to noncompetitive goods has been aptly described as "vexing" and one that "does not become easier of solution with the years." [23] However, after a thorough and word-by-word study of the trial record, examination of the exhibits, reference to my trial notes, an appraisal of the demeanor of the witnesses, an evaluation of the pertinent factors, and upon the totality of the evidence, I find that upon the present state of the record Barry has failed to sustain its burden of proof to warrant the equitable and other relief it seeks on its claim of trademark infringement, unfair competition or false designation of origin of goods.

At the outset it should be emphasized that this is not a case where plaintiff, the junior user, in incorporating under the name Mushroom Makers, Inc. and adopting MUSHROOM for its mark on its new line of women's sportswear, was attempting to get a free ride or to capitalize on Barry's mark or its good will. Also, while not essential to its position in seeking to protect its trademark rights, Barry contends that MUSHROOMS has become a famous or popular name so that its use on any product at once suggests to the average consumer that Barry is its source or origin.[24] But the record is barren of any evidence to support this claim.

With this preliminary finding, we turn to a consideration of other factors which are to be evaluated in deciding whether Barry is entitled to enjoin plaintiff's use of MUSHROOM.

(1) Strength of mark and degree of similarity.

■ These may conveniently be considered together. There can be little dispute that the word MUSHROOM is an arbitrary and fanciful mark since its use on products sold by the parties is nondescriptive or suggestive of its wares. It is descriptive neither of shoes, sandals, slippers, the items sold by Barry, nor sportswear sold by plaintiff.[25] So, too, there can be no

**21.** *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

**22.** *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 1099 (2d Cir. 1969), *cert. denied,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970); *see Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.,* 308 F.2d 196, 198 (2d Cir. 1962).

**23.** *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

**24.** *Cf. Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 494 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp.,* 350 F.Supp. 1341, 1358 (E.D. Pa.1972), *aff'd without opinion,* 480 F.2d 917 (3d Cir. 1973).

**25.** The finding that MUSHROOM[S] is a fanciful, nondescriptive mark obviates the need to pass upon a contention pressed by Barry at various times during this litigation: that its mark has achieved a "secondary meaning." *Cf. W. E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 661 (2d Cir. 1970).

The doctrine of secondary meaning, strictly applied, refers to the protection afforded geographic or descriptive terms that a producer has used to such an extent to lead the general public to identify the producer or the product with the mark. The Law of Unfair Competition, Trademarks and Monopolies § 77.1, at 337 (3rd ed. 1969); 3 Callmann, *See Safeway Stores, Inc. v. Safeway Properties, Inc.,* 307 F.2d 495, 498–99 (2d Cir. 1962). Thus establishment of secondary meaning permits a user to protect an otherwise unprotectable mark. Barry apparently recognizes that it need not establish secondary meaning in order to protect

question that as spoken and written, MUSHROOM and MUSHROOMS are for all intents and purposes identical. The average speaker or listener is not likely to differentiate MUSHROOMS from MUSHROOM; nor is a purchaser likely to notice a difference in the written marks. However, plaintiff and defendant use different logos above their marks; plaintiff uses a stylized letter "M", whereas defendant uses a design of a mushroom.

■ In a conceptual sense, MUSHROOMS, when applied to items other than the natural product which its name denotes, is a strong mark. But its true strength must be tested in the market place; the registration of the mark with the Patent Office is not evidence of what happens in the market place or that customers are familiar with its use.[26] While Barry, from the time it first marketed its products in 1974, has sold over $6 million of goods nationwide through over 2500 distributors, has advertised extensively, and actively sought to protect its right to use the mark for its products, it has not established that MUSHROOMS has gained wide recognition in the public mind, nor is it readily identified by the ultimate consumer as the source of any particular product. Barry has offered no evidence that any ultimate consumer has come to recognize all goods bearing the name MUSHROOMS as originating with Barry.[27] In sum, the defendant's mark, while a strong one conceptually because it is fanciful and arbitrary, has not realized its potentiality in the market place—in short, it has not "caught on" and in a commercial sense thus far is not a strong one.

(2) The proximity of the products.

The products sold by the parties are not similar; they are separate and distinct. The parties are not in competition in the sale of their products. Barry's footwear is designed for comfort and casual wear. Most of its styles are of the open variety, although it does market various styles of boots. The products range in price from $18 to $40 per pair, and sales are directed to the 20 to 45 year old woman.

Plaintiff's sportswear, consisting of a casual type of women's jeans, jackets, shirts and overalls, sells at retail in the price range of $14 to $45 per item and the sales are directed to consumers 20 years of age and older. Barry and Mushroom Makers both market their respective products by selling directly to retail outlets, particularly major department stores; both also sell directly to boutiques and speciality shops.

■ Though the products sold are separate and distinct and are sold in different departments of the retailers, if they are sufficiently related in the public mind, under appropriate circumstances the senior user of the mark may be entitled to protection against use by others.[28]

Barry contends that the goods are "related" and that plaintiff's use of MUSHROOM on women's sportswear leads the consumer to believe that Barry is the source or origin of those products. Barry finds support in

its mark. However, it urges that its use of the MUSHROOMS mark has created secondary meaning in that the consuming public now identifies the mark with R. G. Barry and the shoes it produces. This claim boils down to the assertion that MUSHROOMS has become a famous mark. Cf. *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403, 410 (S.D.N.Y.1974). As noted above, Barry has not carried the burden of proof on this point.

26. Cf. *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1173 (2d Cir. 1976) (quoting *Lilly Pulitzer, Inc. v. Lilli Ann Corp.*, 376 F.2d 324, 325, 54 CCPA 1295 (1967)).

27. Mere sales or advertising figures are inconclusive on the issue. Cf. *Exquisite Form Indus., Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403, 411 (S.D.N.Y.1974). This is particularly so in the instant case, since Barry products are widely distributed through more than 2500 outlets. Thus although total national sales volume may be high, actual sales in a specific geographic or local area may be in small quantities or insufficient amounts to attract public notice to the name attached to the product. Moreover, the high ratio of advertising cost to net sales (19.5%) suggests difficulty in establishing the mark, rather than, ipso facto, wide recognition of the mark.

28. See cases cited in note 15 supra.

*Avon Shoe Co. v. David Crystal*[29] and other cases[30] for its position that in the women's apparel field trademarks are used to denote a common source for shoes and sportswear. Barry offered evidence that the same trademarks have been applied to footwear and related clothing articles.[31] Plaintiff, on the other hand, asserts that women shopping for shoes and clothing are sophisticated in their choice of products. It asserts that MUSHROOMS is not a popular name, and modern merchandising methods in department stores militate against the likelihood of purchasers being misled or deceived that women's sports clothes bearing the mark MUSHROOM originated with Barry.

While *Avon* appears to support a claim that an average purchaser would likely suppose that women's shoes and apparel bearing the same mark emanated from the same source, this Court considers it just as likely that the average purchaser of these products is discriminating,[32] particularly since MUSHROOMS has not achieved the status of a popular or readily recognized name. On the scanty record the Court cannot deem the element of the relatedness of the products a substantial factor in Barry's favor.[33]

**(3) Bridging the gap.**

The term "bridging the gap" has been used to describe the senior user's interest in preserving avenues of expansion and entering into related fields. Barry has failed to establish a likelihood of expansion into plaintiff's field. At various stages through the years, Barry sold and then discontinued the sale of such items as terry cloth bathrobes, seat covers, chaise lounge covers, throw pillows, handbags, scarves and belts. Presently, as noted, it only manufactures and sells casual footwear. However, it points to a recently conceived plan, initiated after plaintiff commenced this action, to establish "Mushroom Shoppes" in department stores, which in order to attract customers would offer additional lines of footwear and accessories such as belts, handbags, scarves and hosiery. Assuming this program, which is only in the talking stage, ever gets off the ground, it does not indicate a likelihood that Barry plans or intends to market women's apparel similar to that marketed by plaintiff. The Mushrooms Division and R. G. Barry, as their past histories indicate, have never manufactured women's outdoor wearing apparel, and the plans for "Mushroom Shoppes" do not contemplate an expansion into the women's sportswear field.

**(4) The quality of plaintiff's product.**

The quality of the sportswear sold by Mushroom Makers, as the defendant concedes, is not questioned. Indeed, the rapid growth of the product line and its commercial success attest to customer satisfaction with, and interest in, plaintiff's sportswear. Thus no basis exists for any claim of tarnishment. Although conceding that plaintiff's products were of high quality, Barry contends that it has the right to be protected against plaintiff's future conduct in the event plaintiff's products decline in quality or it assigns the mark to a producer of inferior goods. This purely conjectural contention borders on the fatuous. It is unjustified based on the evidence presented at

---

**29.** 279 F.2d 607 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960).

**30.** *General Shoe Corp. v. Hollywood-Maxwell Co.,* 277 F.2d 169, 47 CCPA 933 (1960); *Carlisle Shoe Co. v. Societe Anonyme: Roger Fare & Cie,* 278 F.2d 519, 47 CCPA 966 (1960).

**31.** These include Buster Brown, Capezio, Dior, Givenchy and White Stag.

**32.** Of course, the sophistication of the purchaser cuts both ways. The mere similarity of labels does not by itself necessarily denote to a sophisticated purchaser a common source.

Such a purchaser of women's sportswear and shoes or slippers, since the products are different, would not necessarily assume they came from the same source. On the other hand, a sophisticated purchaser may know that several well known designers distribute both footwear and sportswear under their highly regarded and well publicized trade names.

**33.** Neither side has presented evidence on the sophistication of the purchasing public or the degree to which consumers identify clothing and footwear merchandisers.

trial.[34] If anything, as was true in *Avon Shoe,* the rapid growth of plaintiff's business from the time of initial marketing and the wide acceptance of its products "will in all probability continue to enhance the value of [the senior user's] mark."[35]

**(5) The good faith of the junior user.**

The Court has already noted that this is not a case where the plaintiff has sought to obtain a "free ride" at Barry's expense. Further and detailed fact finding is merited since defendant presses the contention that plaintiff's conduct has been marked by bad faith and constitutes "deliberate infringement" and "commercial piracy."[36] These vigorously expressed accusations are without substance.

A starting point is the origin of the use of MUSHROOM by plaintiff, which as already noted was suggested by Earle Sheldon, who was instrumental in establishing the feasibility of the misses sportswear line. Sheldon testified that he selected MUSHROOM as the mark because it was a favorite item of an aunt by whom he had been raised. Her interest manifested itself to the extent that she not only enjoyed mushrooms as a food, but she also had mushroom collections, mushrooms on her doorknobs, and wore mushrooms around her neck. Sheldon thought MUSHROOM would make an excellent trademark, which he recommended to Feinberg, president of Stevens, who accepted his suggestion. Sheldon swore that he had never heard of the defendant and that the only use of MUSHROOMS known to him in connection with goods was by a phonograph record company. Since Sheldon's explanation of the basis of his suggestion of the origin of the trademark may be viewed skeptically[37] or even with suspicion,[38] this Court was particularly alert in its appraisal of Sheldon's credibility. After such a critical appraisal, the Court is satisfied that Sheldon testified truthfully as to the basis of his recommendation of MUSHROOM for the trade name of the new product line, as he did with respect to other material matters.

There remains to be considered the actions of Feinberg, the Stevens executive who acted upon Sheldon's recommendation. Before acting upon Sheldon's suggestion, Feinberg caused a search to be made as to the availability of the suggested trademark, and as a result he learned of the Barry registration. Since Stevens had such notice, plaintiff, its affiliate, has the burden of justifying the adoption and use of an almost, if not identical mark.[39]

Feinberg testified that, aware of Barry's registration, he nonetheless decided to proceed to use MUSHROOM on plaintiff's new line of misses sportswear since he saw no conflict between it and defendant's line of casual footwear. Feinberg further swore that he had never heard of Barry or MUSHROOMS prior to the registration search report; that he had not seen the notice placed by Barry in Women's Wear Daily on July 14, 1975,[40] nor was he aware

**34.** Compare *Federal Telephone & Radio Corp. v. Federal Television Corp.,* 180 F.2d 250, 251 (2d Cir. 1950).

**35.** *Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607, 614 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960).

**36.** See *Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co.,* 349 F.2d 389 (2d Cir. 1965), *cert. denied,* 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966).

**37.** Cf. *G. B. Kent & Sons, Ltd. v. P. Lorillard Co.,* 114 F.Supp. 621, 626 (S.D.N.Y.1953), *aff'd on opinion below,* 210 F.2d 953 (2 Cir. 1954).

**38.** See *Decca Records v. Musicor Records,* 314 F.Supp. 145, 147–48 (S.D.N.Y.1970) (quoting

*Florence Mfg. Co. v. J. C. Dowd & Co.,* 178 F. 73, 75 (2d Cir. 1910)).

**39.** *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 1101 (2d Cir. 1969), *cert. denied,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970).

**40.** The defendant urges that since plaintiff's attorneys requested a trademark search report on July 15, 1975, one day after the Women's Wear Daily notice appeared, the inference is warranted that Feinberg did see the notice and that his decision to proceed with the MUSH-ROOM mark for women's apparel was made in bad faith and intended to obtain a free ride. I accept Feinberg's sworn denial.

of any use of the mark by Barry. Finally, he stated that the trade name MUSH-ROOM was adopted by plaintiff not only in his firm belief that the separate and distinct nature of the products presented no conflict, but after consultation with his attorney, who at his direction thereafter filed the registration application for MUSH-ROOM as a trademark for the new line.

The fact that one believes he has a right to adopt a mark already in use because in his view no conflict exists since the products are separate and distinct cannot, by itself, stamp his conduct as in bad faith, even after the Patent Office has refused the mark registration. Any such doctrine would preempt a mark exclusively in favor of a senior user for all related products. In *Triumph Hosiery Mills, Inc. v. Triumph International Corp.,* the Court stated:

> An "innocent" or a bona fide junior user . . . is one, we think, whose use is not attributable to intent to obtain a free ride on the reputation of the owner of the trade-mark. . . . From the bare fact that the Patent Office had refused the defendants' application for registration . . . it did not follow that the defendants could not have honestly believed that on a weighing of all the relative and variable pertinent factors a court of competent jurisdiction would not permit them to use the trade-mark. . . . Surely, error of an alleged infringer of a trade-mark, or indeed of a patent, in forecasting the decision of the ultimate arbiter, is not a species of bad faith which constitutes independent and substantive proof of infringement.[41]

The Court finds upon the totality of the evidence that when MUSHROOM was recommended by Sheldon and accepted by Feinberg as a trademark for plaintiff's new line of misses sportswear, Feinberg was without knowledge of Barry's mark or its use on its casual footwear line; that thereafter when the trademark search revealed the Barry registration and plaintiff continued to use MUSHROOM for its products, it did so in the good faith belief that the difference in the marketing and sales by plaintiff of misses sportswear under the name MUSHROOM and by the defendant of casual footwear under the name MUSH-ROOMS presented no conflict.

It is significant that when plaintiff decided to proceed with the use of its mark in the summer of 1975, apart from the fact that Barry and its mark were unknown to plaintiff, the level of Barry sales was low and it had been merchandising casual footwear for only a short period under its mark. Thus its net sales in 1974 totalled only $75,000 and for the first six months of 1975 approximately $500,000. These factors, when considered with the fact that Barry's mark had but recently been used in commerce and was not well known, repel any finding of intent by plaintiff to trade upon defendant's mark or to obtain a "free ride." The Court concludes that at the time Mushroom Makers decided to initiate a line of misses sportswear and market the line under the name and mark of MUSHROOM, the individuals involved acted in good faith and without intent to appropriate or trade upon Barry's MUSHROOMS trademark or to mislead the purchaser as to the source of its goods.[42]

(6) Actual confusion.

During the period the parties have used their marks, their sales volume has expanded and hundreds of thousands of units of their respective commodities have been sold, often in the same department stores

---

**41.** 308 F.2d 196, 199 (2d Cir. 1962). *See Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607, 611 n.6 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960).

**42.** Barry asserts that the original application for registration of the MUSHROOM trademark contained several inaccuracies and misstatements and that these reflect on the good or bad faith of the junior user. Even if the Court were satisfied, which it is not, that these were deliberate and fraudulent statements, such errors are not relevant to the ultimate finding of likelihood of confusion or trademark infringement. *Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607, 613 n.8 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960).

and specialty shops. It is therefore significant that the defendant failed to offer evidence that a single purchaser was confused, misled or deceived as to the source or origin of the product he or she was buying.[43] Indeed Barry's principal executive, whose functions included visiting stores throughout the country and attending shoe conventions, testified he knew of no such incident. Further, not a single salesperson or retailer was called to testify as to confusion on his or her part or that he or she knew of a single instance of consumer confusion. This omission is underscored by the fact that defendant is a substantial corporation with the means to have undertaken either a survey or an investigation to establish instances of actual consumer confusion.[44]

The absence of proof of consumer confusion is highlighted by Barry's own action when its right to use MUSHROOMS was challenged by Famolare, a firm which was a prior user of the trademark MUSHROOM HUNTER—a mark which it applied to shoes, a product directly related to those sold by Barry. When challenged, Barry entered into an agreement whereby Famolare was permitted to market MUSHROOM HUNTER shoes. Thus, Barry's contention of likelihood of confusion is undermined by its own action.[45] On this aspect of the case it is no answer to say that Barry was buying its peace in the face of threatened litigation. So, too, it is a feeble answer for defendant to assert, as it does, that it only consented to the use of MUSHROOM HUNTER and not MUSHROOMS. The

fact is that the goods sold by each were in the same product line, which would more readily suggest likelihood of confusion than where the products are separate and distinct.

■ However, the fact that no case of actual consumer confusion has been established, while probative,[46] is by no means determinative since such proof may be difficult to obtain.[47] Barry therefore places great weight on evidence it introduced of over a dozen instances of misdirected invoices, checks, return slips or return goods from retail stores that Barry had received which were intended for plaintiff, and one instance where plaintiff received a return of defendant's goods. These instances indicate some kind of confusion on the part of employees of the retailers, but the testimony of the persons involved was not obtained and no explanation was offered for the errors. In some instances it is obvious they were the result of carelessness or inefficiency on the part of employees of the retailers. While these few instances of confusion on the part of retail employees, out of hundreds of thousands of transactions throughout the country may have some probative value, they are far from compelling.[48]

In addition, defendant relied upon two other examples to support its claim of likelihood of confusion. One was an advertisement in a Rochester newspaper by a department store which pictured both MUSHROOM apparel and MUSHROOMS shoes. The other was a photograph of the Hecht

---

**43.** *Compare Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 236, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); *G. B. Kent & Sons, Ltd. v. P. Lorillard Co.,* 114 F.Supp. 621, 627 (S.D.N.Y. 1953), *aff'd on opinion below,* 210 F.2d 953 (2d Cir. 1954).

**44.** Such surveys are not uncommon in these types of cases. *See, e. g., Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1340–41 (2d Cir. 1975); *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 492 (S.D.N.Y.1968).

**45.** *Cf. California Fruit Growers Exchange v. Sunkist Baking Co.,* 166 F.2d 971, 975 (7 Cir. 1947).

**46.** *See Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co.,* 513 F.2d 1183, 1188 (2d Cir. 1975); *Kiki Undies Corp. v. Alexander's Dept. Stores, Inc.,* 390 F.2d 604, 606 (2d Cir. 1968).

**47.** *See Miles Shoes, Inc. v. R. H. Macy & Co., Inc.,* 199 F.2d 602, 603 (2d Cir. 1952), *cert. denied,* 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953).

**48.** *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1340 (2d Cir. 1975); *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.,* 281 F.2d 755, 761 (2d Cir. 1960); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538, 543 (2nd Cir. 1956).

Company store in Tyson Corner, Virginia, which showed MUSHROOMS shoes and MUSHROOM sportswear apparel displayed side by side near the entrance of the store. Defendant offered no evidence as to the circumstances surrounding these incidents. Counsel for defendant visited the Tyson Corner store and was present when the photograph was taken, but failed to inquire of store personnel how it came about that the two products were so displayed.

With respect to the Rochester advertisement, no evidence was offered whether the department store owner knew it was advertising the products of two separate companies or whether it believed that the items originated from the same source. Indeed, since the defendant paid for part of the advertisement (although it did not give prior authorization), it would be unlikely that the store was misled or confused as to source of origin. Nonetheless, these two instances are probative on the issue of likelihood of confusion of the ultimate consumer to whom the display and advertisement were intended to appeal. But the fact remains that as previously noted, and despite intensive pretrial discovery the terminal date of which was extended on defendant's application to obtain such evidence, no instance of actual consumer confusion has been offered or established.[49]

The various factors that have been identified by the Court of Appeals as relevant on the issue of likelihood of confusion thus point in both directions. The substantial identity of the marks, the fact that the products are sold in the same stores, that both products are women's wear, the evidence that personnel of retailers mistake one company for the other, or associate the two marks, and the refusal of the Patent Office to register plaintiff's mark all support a finding of likelihood of confusion. On the other hand, the absence of a single instance of actual consumer confusion, the fact that defendant's mark is not well known, the lack of proof of wide recognition of defendant's product in the consumer market,[50] the lower level of defendant's sales as compared to plaintiff's, the good faith of plaintiff in adopting its mark and the unlikelihood that defendant will enter the women's sportswear field militate against defendant's claim of confusion.

## CONCLUSION

Upon all the evidence, the likelihood of confusion is far from compelling. In the final analysis, in the absence of any instance of confusion and taking into account the difficulty of obtaining such proof, whether likelihood of confusion exists is a matter of judgment. And the ultimate question is not whether now and then such incidents are likely to or do occur. It is not enough "that a few particularly undiscerning persons might be misled."[51] Rather, it is, as so often stated, whether an appreciable number of ordinarily prudent purchasers,[52] or as most recently put, "many customers" are likely to be misled or deceived as to the origin of the goods.[53] Upon the

49. On the other hand, the plaintiff submitted the findings of an investigation conducted by two private investigators. It consisted largely of hearsay evidence based on responses from sales personnel in shoe and clothing departments of department stores where both products were sold. While such evidence is of slight probative value, it does indicate that none of the salespersons selling one of the products was aware that the other product was also being sold in the department store.

50. In *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.),* 544 F.2d 1167, 1170 (2d Cir. 1976), the senior user introduced extensive evidence of wide recognition in the particular consumer market.

51. Restatement (Second) of Torts § 729, Comment a at 118 (Tent. Draft No. 8, 1963).

52. *Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538, 542 (2d Cir. 1956); *G. B. Kent & Sons, Ltd. v. P. Lorillard Co.,* 114 F.Supp. 621, 625–26 (S.D.N.Y.1953), *aff'd on opinion below,* 210 F.2d 953 (2d Cir. 1954); Restatement (Second) of Torts § 729, Comment a at 118 (Tent. Draft No. 8, 1963).

53. *Scarves by Vera, Inc. v. Todo Imports, Ltd. (Inc.),* 544 F.2d 1167, 1175 (2d Cir. 1976).

present state of the record, likelihood of confusion is minimal; but it is unrealistic not to recognize that since the marks are substantially identical, likelihood of confusion does exist as a latent and volatile factor, which with the passage of time and probable increase in sales by the senior and junior users, may become a reality.

However, as noted at the outset, the Court must evaluate the interests and equities involved, including the protection of the consumer public. In the *Avon* case, upon which defendant relies, the Court found a likelihood of confusion and still denied injunctive relief. The Court stated that it was the duty of the trial judge to "balanc[e] the conflicting interests both parties have in the unimpaired continuation of their trade mark use." [54] As most recently stated in this Circuit: "*absent equities in the junior user's favor,* he should be enjoined from using a similar trademark whenever the non-competing products are sufficiently related that consumers are likely to confuse the source of origin." [55]

Evaluation of the relevant interests and equities, based on the facts found above, indicates that the scales tip in favor of the plaintiff. Defendant has not demonstrated that it has been or will be harmed by plaintiff's use of its mark on women's sportswear. It has not shown that plaintiff's goods are inferior or that it plans to move into the women's sportswear field. Nor does the record support any claim that the plaintiff attempted to obtain a free ride on Barry's reputation or to appropriate its good will. To the contrary, the plaintiff has forged ahead on its own, achieving substantial success through the quality of its product and management. Plaintiff acted in good faith in adopting its mark; there is

no evidence of any intent to palm off or deceive the public as to the origin of its goods. There is no evidence that up to now a single consumer has been confused, deceived or misled as to the source or origin of footwear or sportswear he or she purchased. In sum, as the Court concluded in *Avon Shoe:*

> Weighed against [the junior user's] interests in preserving the substantial good will they have created by means of their extensive concurrent use of [their] mark in good faith, the [senior user's] interests and any resulting confusion are factors too slight to outweigh the [junior user's] interest. [56]

To uphold Barry's claim that its trademark extends to products beyond those it now sells would, upon the facts here presented, be inequitable. The validity of its trademark does not, by itself, confer upon Barry the right to preempt all other uses of the mark on wearing apparel or accessories. As Judge Learned Hand, in his usual penetrating way, cautioned:

> Although there appears to be a persistent belief that the first use of a specific name or description gives a power to the first user to prevent its use by others, it is important to remember that no such doctrine exists. In all such cases there is only one question: what damage to the first user will the second do by the use of the first user's mark, or name or makeup, and what burden will it impose upon the second user effectively to distinguish the goods? [57]

The answer upon this record is that there is no evidence the senior user has been damaged; moreover, to bar plaintiff from the use of its mark, which was adopted in good faith, would impose an undue burden on it.

**54.** *Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607, 613 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960).

**55.** *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.),* 544 F.2d 1167, 1173 (2d Cir. 1976) (emphasis supplied). *See Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 536 (2d Cir. 1964).

**56.** *Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607, 614 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960).

**57.** *Federal Telephone & Radio Corp. v. Federal Television Corp.,* 180 F.2d 250, 251 (2d Cir. 1950).

## BARRY'S OTHER CLAIMS

Throughout the litigation, both parties have agreed that the standard governing the trademark infringement claim also governs the unfair competition and false designation claims.[58] Thus there is no occasion for extended discussion of those claims. Suffice it to say that there has been no showing that Mushroom Makers has violated any "principles of old fashioned honesty."[59] Nor does the record support a finding that plaintiff has falsely represented its goods, undermined Barry's reputation, or misappropriated Barry's business.[60]

## RELIEF

██ Based on the findings of fact and conclusions of law, the Court declares that plaintiff's use of the trademark MUSHROOM as applied to women's sportswear does not infringe on defendant's trademark as applied to shoes, slippers and sandals, nor does it constitute unfair competition or false designation of origin of goods. However, this judgment speaks only as of the date of its entry. The Court has already noted the latent potentiality that likelihood of confusion may with the passage of time become a reality. Given the rapid growth of the companies involved and the continued use by them of their marks on the respective products they sell, the defendant may arguably contend that a change of circumstances would justify relief to it as the senior user and bring another action charging plaintiff with infringement or unfair competition.[61] Because of these factors, the judgment to be entered shall contain a provision directing that when plaintiff uses its mark on its products it shall include a statement prominently displayed in words or substance that it does not manufacture or sell shoes, slippers or sandals or that it is not associated with the makers of MUSHROOMS footwear. The form of notice shall be agreed upon by the parties. In the absence of such agreement, each may submit suggested forms for the Court's determination.[62]

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Accordingly, judgment may be entered in favor of plaintiff and dismissing the defendant's counterclaims.

---

**58.** See Exquisite Form Indus., Inc. v. Exquisite Fabrics of London, 378 F.Supp. 403, 414 (S.D. N.Y.1974); Apollo Distrib. Co. v. Apollo Imports Inc., 341 F.Supp. 455, 458 (S.D.N.Y.1972).

**59.** Radio Shack Corp. v. Radio Shack, Inc., 180 F.2d 200, 206 (7th Cir. 1950); see Pocket Books, Inc. v. Dell Publishing Co., 49 Misc.2d 252, 267 N.Y.S.2d 269, 273 (Sup.Ct.1966) ("the touchstone for the exercise of the Court's equity power remains . . . unfairness").

**60.** American Heritage Life Ins. Co. v. Heritage Life Ins. Co., 494 F.2d 3, 14 (5th Cir. 1974); Geisel v. Poynter Prods., Inc., 283 F.Supp. 261, 267 (S.D.N.Y.1968).

**61.** Cf. King Research, Inc. v. Shulton, Inc., 454 F.2d 66, 69 (2d Cir. 1972); see also Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 498 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

**62.** See Dwinell-Wright Co. v. White House Milk Co., 44 F.Supp. 423, 428 (W.D.N.Y.1942), aff'd on other grounds, 132 F.2d 822 (2d Cir. 1943); cf. DuPont Cellophane Co., Inc. v. Waxed Prods. Co., 85 F.2d 75, 82 (2d Cir. 1936), cert. denied, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936), cert. denied, 304 U.S. 575, 58 S.Ct. 1047, 82 L.Ed. 1539 (1938); Allegretti Chocolate Cream Co. v. Keller, 85 F. 643 (C.C. S.D.N.Y.1898).