**The GRENADIER CORPORATION, Plaintiff,**

v.

**GRENADIER REALTY CORPORATION, Defendant.**

**No. 82 Civ. 4939.**

United States District Court, S.D. New York.

July 28, 1983.

Curtis, Morris & Safford, P.C., Eslinger & Pelton, P.C., New York City, for plaintiff; John A. Mitchell, Dickersen M. Downing, New York City, of counsel.

Gottlieb, Rackman & Reisman, New York City, for defendant; James Reisman, Glenn F. Ostrager, New York City, of counsel.

OPINION

FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

This is a trademark infringement and unfair competition action brought under the

Lanham Act[1] and New York statutory[2] and common law. Plaintiff is The Grenadier Corporation, founded and incorporated by George Grenadier in 1950. Defendant is the Grenadier Realty Corp., a wholly owned subsidiary of Starrett Housing Corporation, founded and incorporated in 1976. In addition to the obvious similarity between the names of the parties, both, at least for a time, had similar trademarks. Plaintiff uses a depiction of a grenadier soldier from the waist up as a trademark which it registered in 1953 and renewed in 1973. Defendant up until 1982 used a depiction of a full grenadier soldier as its logo. Prior to the commencement of this action it discontinued that logo and represents it has no intention of resuming its use. Instead it uses a building design logo backed by a capital "G." Neither of defendant's marks is registered. Plaintiff seeks injunctive relief,[3] and defendant has counterclaimed for a declaration of non-liability.

Plaintiff is primarily engaged in the structural waterproofing and masonry repair industry in the New York metropolitan area. It also engages in related activities, installation of special types of flooring, the protective treatment of terrace decks, and the weather sealing of glass contained wall buildings. Revenues exceed $1,000,000 per year and it is considered by experts to be one of the three or four top firms in the field. Its president, George Grenadier, has extensive experience in the trade and is highly respected. Almost from its inception, plaintiff also enjoyed an enviable reputation, being selected to repair such well known structures in New York City as the Lever House, the Chase Manhattan Center, the Dakota apartments and the Cathedral of St. John the Divine, as well as well known buildings elsewhere. In addition, plaintiff's activities have been recognized in the media and trade journals, which it has supplemented with its own advertising campaigns. Aside from magazines and trade journals, plaintiff has engaged in extensive mailings, and Mr. Grenadier has lectured at a variety of construction industry conferences attended by technicians, architects and engineers.

Defendant is principally involved in the management of large public and private sector residential housing in the New York metropolitan area. It performs a variety of services for its customers—principally building owners and cooperative properties—including computerized billing, rent collections and security services; also it provides comprehensive fuel economy programs staffed by engineers and preventive maintenance programs. Defendant advertises extensively, especially since 1980 when it began a major mailing campaign. In addition, defendant's president, Robert C. Rosenberg, has lectured before a wide number of audiences, and has appeared on numerous local television programs. On all such occasions, he has been introduced as president of the defendant corporation.

We begin discussion "with the oft-repeated observation that the essential question in any case of alleged trademark infringement brought under the Lanham Act or under the law of unfair competition is 'whether a substantial number of ordinarily prudent purchasers are likely to be misled or confused as to the source of the different products.' "[4] In short, likelihood of confusion is the "touchstone" of trademark infringement.[5] The inquiry proceeds through an analysis of several well identified factors, described more fully below, with an eye toward the equities involved, and with

---

1. 15 U.S.C. § 1125(a).

2. N.Y.Gen.Bus.Law §§ 133, 368–d (McKinney 1968).

3. Plaintiff has withdrawn its claim for monetary damages.

4. *Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147, 154 (S.D.N.Y.1980) (footnote omitted).

5. *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 441 F.Supp. 1220, 1225 (S.D.N.Y.1977), *aff'd,* 580 F.2d 44 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

deference to the interests of the senior user, the junior user and the public.[6]

■ At the outset, the defendant urges the Court to forego analysis of the likelihood of confusion by claiming that plaintiff has unreasonably delayed before taking action to protect its mark, and whatever the merits of its claim, is barred from recovery by laches. To succeed on this defense, defendant must establish that plaintiff had knowledge of the use of its mark, that it inexcusably delayed in taking action with respect thereto and that defendant will be prejudiced by permitting plaintiff to assert its rights at this time.[7]

Plaintiff first learned of the defendant's use of its mark in 1977 or 1978. Immediately thereafter plaintiff telephonically contacted defendant about the matter and made several subsequent calls as well. However, the calls did not achieve their intended purpose. Plaintiff took no further action at that time. In late 1979, early 1980, defendant began to expand its business; while previously it has only managed Starrett properties, it actively sought other clients. As part of its expansion plans, defendant initiated an extensive marketing drive in early 1980 by distributing a large number of mailings. As a result, plaintiff received inquiries as to whether it had entered the real estate management field. This expanded activity by the defendant led plaintiff's counsel, in May of 1980, to write to defendant demanding that it discontinue use of the name and mark. Subsequently the parties engaged in a protracted series of negotiations and meetings that stretched out over a two-year period. In part as a consequence of these meetings defendant discontinued use of its soldier logo. When the parties could reach no further accommodation, this action was filed.

■ The Court holds that on this record defendant has failed to establish either unreasonable delay or undue prejudice. During the years from 1977 through 1980, defendant primarily, if not exclusively, managed Starrett-owned developments. Only when it began to compete with other managing agents, some of whom then were and others likely customers of plaintiff, was there likely to be an "actual clash of interests."[8] While plaintiff might have been more vigorous up to 1980 in asserting its claims, under all the circumstances it cannot be faulted entirely for its failure to initiate legal proceedings prior to the commencement of this suit. The exchange of correspondence and negotiations between the parties and their counsel up to that period reflect that plaintiff did not forego or intend to forego its claim to the use of the mark. Indeed, plaintiff obtained some partial relief when defendant discontinued use of the Grenadier soldier logo. The defense of laches, which would foreclose any relief to plaintiff is rejected, although plaintiff, if it is entitled to relief upon its claim, must bear the burden of its delayed action based upon equitable considerations. Thus we proceed to analyze the merits of plaintiff's claim to relief.

■ The judicial determination of whether there exists a likelihood of confusion between non-competitive marks rests upon an analysis of various factors. These include, but are not limited to:

> the strength of [the senior user's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of the defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of buyers.[9]

**6.** *See generally id.*

**7.** *Vichey Spring, Inc. v. Lehman,* 625 F.2d 1037, 1040 (2d Cir.1980); *Cuban Cigars Brands, N.V. v. Upmann Int'l, Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y.1978), *aff'd,* 607 F.2d 995 (2d Cir. 1979).

**8.** *Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866, 881 (E.D.N.Y.1978). *See Lottie*

*Joplin Thomas Trust v. Crown Pub.,* 592 F.2d 651, 655 n. 4 (2d Cir.1978); *Dunfey Hotels Corp. v. Meridien Hotels Investments,* 504 F.Supp. 371, 377 n. 18 (S.D.N.Y.1980).

**9.** *Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *See also Mushroom Makers, Inc. v. R.G. Barry Corp.,*

The Court considers each relevant factor in turn.

### 1. Strength of the Mark

█ Although defendant introduced testimony from two experts who claimed to have never heard of plaintiff, the bulk of testimony was to the contrary. Other experts testified that plaintiff was well known and had a reputation of distinction. This was also borne out in reports in trade journals and other media. Similarly, plaintiff's substantial revenue is an indicia that it is a factor in the structural waterproofing and masonry repair industry in the New York metropolitan area, and even more so are the prestigious buildings it was entrusted to perform work on. Thus, the Court concludes that plaintiff's fanciful [10] trade name is strong.

### 2. Similarity between the Marks

There can be little doubt that "The Grenadier Corporation" and "Grenadier Realty Corp." are substantially similar. The public will little notice "Realty," but is certain to be aware of the identical "Grenadier" in each title.[11] Moreover, the logos of the parties were virtually the same. Although defendant has, since early 1982, discontinued use of its soldier logo, it was employed for six years. While the defendant's change in logo will undoubtedly reduce the likelihood of confusion in the future, the close similarity in the names of the parties will endure.

### 3. Proximity of the Services Offered by the Parties

Plaintiff and defendant are engaged in different businesses. Plaintiff admittedly does not manage residential property, and has no intention of entering that field; nor does defendant engage in masonry repair or waterproofing. In its advertising, however, defendant does state that among the services it offers, one is "preventive maintenance." Moreover, virtually all of the experts testified that in the trade, "preventive maintenance" included waterproofing and masonry repair, which is plaintiff's basic business. Defendant responds that it does not perform such work; rather, it contracts it out to others. This latter fact, however, is not stated in any of defendant's ads. Significantly, both attract business in the general real estate field, and at times advertise in the same trade journals. Moreover, those likely to hire plaintiff are managing agents of buildings who may be direct competitors of defendant, and in consequence may be deterred from engaging the plaintiff's services in the belief that it is a competitor's subsidiary.[12] In sum, while the services offered by the parties are not identical, they are in some proximity.[13]

### 4. Actual Confusion

Although defendant denied having knowledge of any confusion of the parties by the public, plaintiff adduced such evidence from a variety of sources. These included plaintiff's customers, defendant's creditors, the media, the New York State Department of Labor, defendant's tenants and potential tenants. And it is not without interest that on one occasion letters which defendant's counsel intended for his client were delivered to plaintiff. Plaintiff has also received numerous pieces of misdelivered mail and dozens of misdirected phone calls. Defendant charges that the latter have lessened since it became listed in the Manhattan phone directory, and that the bulk of confusion amounted to little more than nuisances and inconveniences to plaintiff of a minor sort. In particular defendant alleges that every one of plaintiff's customers who made inquiries were

441 F.Supp. 1220 (S.D.N.Y.1977), *aff'd*, 580 F.2d 44 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

**10.** *See Stix Products, Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479 (S.D.N.Y.1968).

**11.** *Cf. id.* at 486.

**12.** One newspaper in fact described plaintiff as a "Starrett subsidiary." Tr. at 81.

**13.** Indeed, one expert testified that some real estate managing agents had entered the contracting field.

set straight by Mr. Grenadier. This, of course, fails to take account of other customers and potential customers who, although they may have been confused, did not make inquiries. The number of incidents of confusion are more than isolated. In sum, there is evidence of actual confusion.

Two further factors support this finding. First, although defendant claimed that it abandoned·its soldier logo voluntarily and for business reasons, it is evident that the change was also made to avoid confusion between the parties. Indeed, the Court finds this to have been a substantial motivating factor. Second, on one occasion, defendant, in an apparent effort to avoid what it perceived to be adverse publicity about plaintiff, sent out flyers with the following postscript: "We are not related to the waterproofing concern of the same name." This is surely evidence that the defendant perceived there to be confusion of the parties by the public. Thus, there is both overt evidence of actual confusion and evidence of defendant's belief of the same.

### 5. Good Faith in Junior User's Adoption

Defendant explains that it came up with the name "Grenadier" after a round table discussion with several executives. The name was chosen to convey security and dependability, hallmarks of the Grenadier Guards. In addition, upon its incorporation, defendant had the New York State Secretary of State's office perform a corporate name search which, surprisingly, failed to turn up plaintiff's name. Plaintiff contends, however, that even a superficial scanning of the New York telephone directory, an exercise defendant did not engage in, would have been sufficient to alert defendant of its existence. Moreover, defendant admits that, prior to the adoption of the soldier logo, it failed to conduct a trademark search in the United States Patent Office.

### 6. Quality of Junior User's Services

The defendant is both a rapidly growing and well regarded real estate managing agent. In addition, defendant's president is both well known and respected in the field. Nevertheless, plaintiff is justifiably concerned about various aspects of defendant's business that it has become aware of. For example, one company with whom both parties do business withheld delivery of items to plaintiff in the mistaken belief that plaintiff had not remitted payment. In fact, plaintiff had paid, and it was defendant who was in arrears on various accounts. In another instance, plaintiff received a dunning letter for medical services provided to one of defendant's employees. In addition, a number of articles in various print publications have criticized defendant. While these matters may not go to the quality of defendant's services, they are clearly negative in character.

### 7. Buyer Sophistication

Defendant emphasizes, and plaintiff does not dispute, that plaintiff's customers are generally quite sophisticated and have come to plaintiff largely through word of mouth. Moreover, defendant contends that the process of hiring someone to perform services offered by plaintiff is long and drawn out over many months since it involves large sums of money and a competitive bidding process. While plaintiff does not seriously dispute this general proposition, it stresses that frequently it is called in on emergencies, for example where a roof is already leaking, and in those cases the bidding process, if any, is less exacting. Moreover, plaintiff explains that even in a typical set up, the solicitation of bids is not as deliberate and careful an exercise as is the eventual awarding of the contract; the process of selecting who will submit bids is more random. With others in the industry performing services similar to plaintiff, it further argues that potential clients may be unlikely to expend the effort to inquire into any relationship between the plaintiff and the defendant. Rather, plaintiff argues, they are more likely to simply invite a bid from one of plaintiff's competitors if they are at all troubled by the similarity between the parties' names. The Court

agrees. Thus, while plaintiff's clients may be sophisticated, the exigencies of the market may undermine that sophistication to some extent. In addition, the nature of the bidding process underscores plaintiff's concern with respect to the significance of confusion among potential customers.

### 8. Conclusion

Based on the foregoing, the Court finds that plaintiff has satisfied its burden of establishing likelihood of confusion. Then there is the question of the appropriate remedy. Our Court of Appeals has noted "*absent equities in the junior user's favor,* he should be enjoined from using a similar trademark whenever the noncompeting products are sufficiently related that customers are likely to confuse the source of origin." [14] There are such equities in favor of the defendant in this case. Defendant has expended substantial time and effort over a seven-year period in building up its name and reputation. The plaintiff was aware of defendant's expansion and increasing activities and the continued use of its name and yet failed to take prompt action. Under the circumstances, in light of plaintiff's failure, when its effort to obtain full relief failed, to bring this action until 1982, it would clearly be inequitable to enjoin defendant from using the name "Grenadier." The Court directs that defendant apply to its various publications and advertisements the following disclaimer: "We are not connected with The Grenadier Corporation, nor do we do any waterproofing or any contracting work" or such a disclaimer as the parties may agree upon. The defendant has represented it has no intention again of using the soldier logo. The decree to be entered shall contain a provision that defendant is enjoined from using a logo depicting a grenadier soldier, as did its prior mark.[15]

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Submit judgment on notice.

---

**14.** *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.),* 544 F.2d 1167, 1173 (2d Cir.1976) (emphasis supplied) (citations omitted). *See also Mushroom Makers, Inc. v. R.G. Barry Corp.,* 441 F.Supp. 1220, 1232–33 (S.D.N.Y.1977), *aff'd,* 580 F.2d 44 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

**15.** This disposition renders plaintiff's claim under section 368–d of the General Business Law moot.