**SPRINGS MILLS, INC., Plaintiff,**

v.

**ULTRACASHMERE HOUSE, LTD., et al., Defendants.**

**No. 79 Civ. 4574 (DNE).**

United States District Court, S. D. New York.

Jan. 21, 1982.

Weiss, Dawid, Fross, Zelnick & Lehrman, New York City (Alan Zelnick, Lowry Wyman, New York City, of counsel), for plaintiff.

Hiram G. Shields and Leo Gitlin, New York City, for defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDELSTEIN, District Judge:

This is an action for trademark infringement, false designation of origin and unfair competition brought under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the common law. The court has jurisdiction of the matter under 15 U.S.C. § 1121 and 28 U.S.C. § 1338.

Plaintiff, Springs Mills, Inc. ("Springs Mills"), is the owner of the registered trademark "ULTRASUEDE," which it has used in the sale of a suede-like fabric made from polyester fibers and polyurethane. Defendant, Ultracashmere House, Ltd. ("UHL"), manufactures and sells "ULTRACASHMERE," a synthetic rayon fabric, and garments made from ULTRACASHMERE. Individual defendant Bart Schwartz is the president of UHL.

1. Springs Mills restricts ULTRASUEDE sales to "top-of-the-line" garment houses, such as Halston, Vera Maxwell, Bill Blass, Mollie Parnis and Jerry Silverman.

## FACTUAL BACKGROUND

For more than eighty years Springs Mills has manufactured, merchandised and sold fabrics and textiles. In 1971, the Skinner Fabrics division of Springs Mills selected the trademark ULTRASUEDE for use on a line of fabric imported from Japan. In 1974, Springs Mills obtained from the United States Patent and Trademark Office two registrations for this trademark, one for the word ULTRASUEDE and the other for a highly stylized version of the word.

ULTRASUEDE fabric is a man-made, suede-like product composed of polyester fibers and polyurethane. The polyester fibers are embedded into a sheet of non-fibrous polyurethane which binds the fibers and "molds" the fabric. ULTRASUEDE was originally made of 60% polyester and 40% polyurethane and is now composed of 70% polyester and 30% polyurethane. Although ULTRASUEDE looks and feels like suede, it is more durable and is machine washable.

Springs Mills sells ULTRASUEDE to fabric retailers and to garment and upholstery manufacturers.[1] Since 1971 domestic sales of ULTRASUEDE have totalled approximately $190,000,000. During this time Springs Mills has expended approximately $500,000 advertising and promoting the ULTRASUEDE trademark. In addition, garment manufacturers and retailers have, without solicitation from Springs Mills, extensively advertised and promoted the ULTRASUEDE trademark. Articles and books about ULTRASUEDE have further publicized the product.

Springs Mills also promotes ULTRASUEDE by providing hang tags displaying the mark to garment manufacturers and to retailers of ULTRASUEDE fabric. Springs Mills distributed three types of hang tags. The most widely distributed hang tag, reproduced below, is provided to garment manufacturers for attachment to garments:[2]

2. Springs Mills distributed approximately 3 million of these hang tags.

FABRIC

A non-leather product of 60%
Polyester 40% non-fibrous
Polyurethane

a Skinner couture fabric

more like suede than suede itself!
feels like suede. . .right down to the
nap!
it's washable — by hand or machine!
won't shrink, pill, fray, crock or
wrinkle!
it's colorfast and won't water-spot or
stiffen!

## CARE INSTRUCTIONS

- MACHINE WASHABLE/DELICATE
  CYCLE/TUMBLE DRYABLE/LOW
  SETTING. USE MILD DETERGENT
  WITHOUT BLUING AGENTS. (i.e.
  IVORY SNOW; WOOLITE)
- DO NOT USE BLEACH
- WASH ALONE TO AVOID STAIN—
  ING FROM OTHER FABRICS
- HAND WASHABLE/HANG TO DRY
  DO NOT WRING OR TWIST
- DRY CLEANABLE BY CONVEN—
  TIONAL METHODS
- PRESS GARMENT ON REVERSE
  SIDE USING PRESSCLOTH AND
  LOW SYNTHETIC SETTING
- LIGHT BRUSHING WILL RE—
  STORE NAP

 Retail & Specialty Fabrics Division

Springs Mills Inc., 1430 Broadway, New York, N.Y 10018

(Front)                    (Back)

Springs Mills provided similar hang tags to retailers of yard goods and hang tags with dry cleaning instructions to manufacturers of non-washable garments.[3]

In 1980 Springs Mills modified its hang tags. On the front of the hang tags, Springs Mills changed the dominant color from yellow to silver and the ULTRA-SUEDE trademark to a single rather than split logo. On the back of the tag, Springs Mills changed the description of the product to "A non-leather product of 100% polyester fibers and non-fibrous polyurethane" and deleted the slogan "More like suede than suede itself."

Defendant UHL is a corporation organized in 1978 which manufactures women's apparel. In 1978 UHL filed an application to register the trademark ULTRACASHMERE for "woven, cashmere-like fabrics

3. Garments manufactured in part from UL-TRASUEDE may require dry cleaning if a component of the garments is non-washable.

... containing synthetic fibers impregnated with synthetic resins." The United States Patent and Trademark Office gave ULTRACASHMERE initial approval for registration. Defendant's application was passed to publication and was opposed by Springs Mills. This opposition is suspended pending determination of this action.

ULTRACASHMERE, imported by UHL from Italy, is a cashmere-like fabric woven from 100% rayon fibers. ULTRACASH-MERE differs from ULTRASUEDE in texture, appearance and manufacturing process. Most of UHL's business is the manufacture and sale of ULTRACASHMERE garments. UHL also distributes a small quantity of ULTRACASHMERE fabric to retailers for over-the-counter sales. ULTRACASHMERE sales since its introduction approximate $1,000,000.

UHL attaches hang tags to the garments it manufactures. UHL's original hang tag is reproduced below.

**ULTRA CASHMERE®**

Multiple Fibre X-14
spun non-fibrous Polyurethane

more like cashmere than cashmere itself! feels like cashmere . . . right down to the nap!
it's washable — by hand or machine!
won't shrink, fray, crock or wrinkle!
it's colorfast and won't water-spot or stiffen.

**CARE INSTRUCTIONS**

● MACHINE WASHABLE / GENTLE DELICATE / TUMBLE DRYABLE 10 MINUTES.
USE MILD DETERGENT (i.e. IVORY SNOW, WOOLITE, DOWNY).
● WASH ALONE TO AVOID STAINING FROM OTHER FABRICS.
● HAND WASHABLE / HANG TO DRY, DO NOT WRING OR TWIST.
● DRY CLEANABLE BY CONVENTIONAL METHODS.
● PRESS GARMENT ON REVERSE SIDE, ON FACE SIDE USING PRESS CLOTH.
● LIGHT BRUSHING WILL RESTORE NAP.

ULTRACASHMERE HOUSE, LTD.
NEW YORK; N.Y.

ULTRACASHMERE HOUSE, LTD.

**(Front)**      **(Back)**

Notwithstanding the representation on the hang tag, ULTRACASHMERE fabric does not contain polyurethane. In addition, there is no industry recognized fiber termed "Multiple Fibre X–14." Further, ULTRACASHMERE fabric shrinks if washed according to the care instructions on this hang tag.

In 1980, after Springs Mills modified its ULTRASUEDE tags, UHL modified the ULTRACASHMERE hang tags. UHL changed the dominant color of the tags to silver, deleted the slogan "More like cashmere than cashmere itself," and replaced the washing instructions with dry cleaning care instructions. UHL has recently designed a new hang tag which it intends to distribute. The new tag is identical to the 1980 tag, except UHL inserted "superior spun raion" (*sic*) under the fiber content description.

On August 29, 1979, Springs Mills commenced this suit, alleging four causes of action: (1) that defendants have infringed Springs Mills' trademark in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), by adopting and using a confusingly similar trademark and logo; (2) that defendants have violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by implying a false association with Springs Mills or its fabric and by falsely representing the fiber content, origin and processing of their fabric; (3) that defendants have unfairly competed with Springs Mills by suggesting a false association between their fabric and Springs Mills'; and (4) that defendants have infringed Springs Mills' common law trademark rights. On December 28, 1979, Springs Mills moved for a preliminary injunction, which was denied by Judge Mary Johnson Lowe of this court on the ground that Springs Mills failed to demonstrate probable "irreparable harm." [4] The case was subsequently transferred to and tried before this court.[5]

## DISCUSSION

### A. Trademark Infringement [6]

■ The central inquiry in all cases of alleged trademark infringement and unfair

---

4. Springs Mills, in its motion for a preliminary injunction, argued that a fifth cause of action, New York General Business Law § 368–d, provided a basis for relief. Judge Lowe did not consider § 368 in denying the motion for preliminary injunction because plaintiff did not state such cause of action in its complaint.

Plaintiff, in paragraph 3 of the pretrial order entered by Judge Lowe, stated:

"Plaintiff seeks to amend its complaint to assert a claim for relief under Section 368(d) of the New York General Business Law. Notice of the assertion of such a claim was given during plaintiff's motion for a Preliminary Injunction and no new or additional factual issues are raised thereby."

Judge Lowe never granted Springs Mills leave to amend its complaint and Springs Mills never petitioned this court to permit it to amend its complaint under Fed.R.Civ.P. 15. Further, Springs Mills did not argue at trial, or in its proposed conclusions of law, or in its post-trial brief, that the requirements of Section 368–d were met.

Defendants, although arguing that Springs Mills could assert no rights under New York law because of plaintiff's failure to amend its complaint, nevertheless discussed the substance of Section 368–d in their post-trial brief. The court, finding that defendants will not be prejudiced, will consider this cause of action. See Fed.R.Civ.P. 15(a), 15(b); *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1086 (2 Cir. 1977).

5. Defendants, in their answer, counterclaimed for damages, contending that plaintiff's institution of this suit "seeks to destroy the goodwill of defendant, UHL as established with its name ULTRACASHMERE." Defendants, however, never raised this argument at trial or in their papers submitted to this court. Indeed, the record is absolutely devoid of any evidence in support of this claim. Accordingly, the court considers defendants' counterclaim abandoned.

6. 15 U.S.C. § 1114(1) provides, in pertinent part:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

The standard for common law trademark infringement is virtually identical. See *Pignons S. A. de Mecanique v. Polaroid Corp.*, 657 F.2d 482, 486–87 (1 Cir. 1981); *Corning Glass Works v. Jeannette Glass Co.*, 308 F.Supp. 1321, 1327 (S.D.N.Y.1970); 2 McCarthy, *Trademarks and Unfair Competition*, § 23:1, at 34

competition is the likelihood of confusion, or the "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2 Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2 Cir. 1979). In a case such as this, where the products are " 'non-competing,' 'different,' or 'non-competitive,' " *Vitarroz v. Borden, Inc.*, 644 F.2d 960, 965 (2 Cir. 1981) (citations omitted), the court determines whether there is infringement by analyzing the now classic factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2 Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961): [7]

[T]he strength of [the prior user's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account.

The *Polaroid* analysis calls for consideration of "the balance of equities," *Vitarroz v. Borden, Inc.*, *supra*, 644 F.2d at 965, and "requires an evaluation of the legitimate interests of the senior user, the junior user, and the consuming public." *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 664 (2 Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980).[8, 9]

---

(1973). The court therefore will not separately analyze the common law trademark claim.

7. The threshold question for application of the *Polaroid* test is whether the products are "different" or "non-competing." The Second Circuit has interpreted "different" or "non-competing" liberally to require application of the *Polaroid* factors in a case where the products "compete to some extent." *See Vitarroz v. Borden, Inc.*, *supra*, 644 F.2d at 965 (holding no infringement of "Bravo" chips by "Bravo" crackers). Thus, the threshold determination is only whether the products are "different" in some way.

The Second Circuit's analysis in *Vitarroz* recognizes that competition between the products, analyzed under the *Polaroid* rubric as "product proximity," is a variable and best considered along with the other *Polaroid* factors. Once the court determines that the products are "different," the relevant inquiry into "how" different the products are, or the degree of difference, should be made in the context of the balancing required by the *Polaroid* test.

8. The trademark laws protect varied interests. Three basic interests are:
first, the senior user's interest in being able to enter a related field at some future time; second, his interest in protecting the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user; and third, the public's interest in not being misled by confusingly similar marks . . . .
*Scarves By Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1172 (2 Cir. 1976). Another important consideration is the senior user's "interest in preventing others from get-

ting a free ride on the reputation and good will he has established . . . ." *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1225 (S.D.N.Y.1977), *aff'd*, 580 F.2d 44 (2 Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). However, "there is a countervailing public interest in not providing an overly broad ambit of protection that would enable the senior user to preclude others from entering unrelated markets into which it has no intention of entering." *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. 147, 159 (S.D.N.Y.1980).

9. As has been pointed out in *Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 924 (S.D.N.Y.1981):
[C]ertain of the *Polaroid* factors are probative of likelihood of confusion, others assist analysis of the balance of the equities, and still others serve to aid both inquiries.
*See* Goldberg & Borchard, *Related Goods Trademark Cases In the Second Circuit*, 70 Trademark Rep. 287, 298, 305–06 (1980). In *Lambda*, the court announced a "two-stage" analysis, separating the *Polaroid* factors into two groups along the above described lines:
The Court thus must first inquire whether the instant case presents any likelihood of confusion, and, if it does, then proceed to strike the balance of equities.
515 F.Supp. at 924. Under this approach, the court first assesses "likelihood of confusion" by addressing the relevant *Polaroid* factors (in *Lambda*, the strength of the mark, similarity of the marks, product proximity, bridging the gap, actual confusion and sophistication of buyers). If the court finds no likelihood of confusion,

**(1) Strength of the mark**

The strength of a trademark determines "both the ease with which it may be established as a valid trademark and the degree of protection it will be accorded." *McGregor-Doniger Inc. v. Drizzle Inc., supra*, 599 F.2d at 1131. Strength is synonymous with the distinctiveness of the mark. As stated by the Second Circuit:

> The term "strength" as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.

*Id.* at 1131. This "origin-indicating" quality is viewed from the eyes of the purchasing public, *id.*, and is thus determined by the cumulative effect of the uniqueness of the mark and the extent of its use and public recognition.

There are four categories into which marks are classified depending upon their nature. In ascending order of strength these categories are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Id.* A generic term[10],

which refers to the "genus of which the particular product is a species", cannot be registered or protected as a trademark. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2 Cir. 1976). A descriptive term[11] is one that "conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Stix Products, Inc. v. United Merchants & Manufacturers Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y. 1968), *cited approvingly in Abercrombie & Fitch Co. v. Hunting World, Inc., supra*, 537 F.2d at 11. A descriptive term can be registered and protected only if it has acquired a secondary meaning or has "become distinctive of the applicant's goods." 15 U.S.C. § 1052(f). A term acquires a secondary meaning when it identifies in the minds of the consumers the producer of the product rather than the product itself. *See American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2 Cir. 1979); *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. 147, 155 (S.D.N.Y. 1980); *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403, 410 (S.D.N.Y.1974).

A suggestive term[12] is one that "requires imagination, thought and percep-

---

then the court need not consider the "balancing of the equities" *Polaroid* factors (in *Lambda*, the quality of the junior user's product, the junior user's good faith and, again, bridging the gap).

This "two-stage" approach of *Lambda* has the advantage of conserving judicial resources by eliminating the need to "strike the balance of equities" if no likelihood of confusion is found. This interpretation is consistent with a line of cases in this circuit which considers only some of the *Polaroid* factors in assessing likelihood of confusion. *See e.g. Grotrian, Helfferich, Schulz, Etc. v. Steinway & Sons*, 523 F.2d 1331, 1336 (2 Cir. 1975) (approving an analysis not employing the "bridging the gap" and "quality of junior user's product" *Polaroid* factors.) However, the *Lambda* approach is inconsistent with the recent Court of Appeals statement in *McGregor-Doniger Inc. v. Drizzle Inc., supra*, 599 F.2d at 1130, that "[i]n assessing the likelihood of such confusion we consider the factors laid out in the now classic *Polaroid* formula . . . ." *See also Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1099 (2 Cir. 1969), *cert. denied*, 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970) ("Rather, the method of approach [of *Polaroid*] requires the trial court to consider and weigh the evidence relative to each of these [*Polaroid*]

points and such other points as, in the particular circumstances before it, the court finds applicable; then, from a balancing of the conclusions reached on all of these factors, the court decides whether or not the parties are entitled to the relief or protection sought."). It should be noted in this regard that in *Polaroid*, the Court of Appeals did not enumerate the factors as a measure of the likelihood of confusion but rather as a measure of "the prior party's chance of success." *Polaroid Corp. v. Polarad Electronics Corp., supra*, 287 F.2d at 495.

Absent clarification from the Court of Appeals, this court will examine all of the *Polaroid* factors in determining infringement.

10. Examples of generic terms are "Aspirin," *see Bayer Co. v. United Drug Co.*, 272 F. 505 (S.D.N.Y.1921), and "Thermos," *see King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577 (2 Cir. 1963).

11. An example of a descriptive term is "Tender Vittles," *see Ralston Purina Company v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129 (S.D.N.Y. 1972).

12. An example of a suggestive term is "Mini Cinema," *see Modular Cinemas of America, Inc. v. Mini Cinemas Corp.*, 348 F.Supp. 578 (S.D.N.Y.1972).

tion to reach a conclusion as to the nature of the goods." *Stix Products, Inc. v. United Merchants & Manufacturers Inc., supra,* 295 F.Supp. at 488. A suggestive term falls in strength between descriptive terms and arbitrary or fanciful terms. Arbitrary or fanciful terms, which comprise the strongest category, include words employed solely for their use as trademarks. Arbitrary terms[13] are familiar words applied in an unfamiliar way; fanciful terms[14] are simply coined terms for the products. *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 11 n.12. Suggestive and arbitrary or fanciful terms can be registered as trademarks without proof of a secondary meaning.

▬▬▬ The mark ULTRASUEDE is suggestive. The term suede, by itself, is a generic term which cannot be registered. The prefix "ultra," however, provides strength to the mark. "Ultra" means "transcending" or "beyond" and is normally used to modify an adjective. Placing "ultra" before the noun "suede," however, does not convey an additional descriptive element in the sense of conveying an immediate idea of the product's attributes. A consumer would not interpret ULTRASUEDE literally to mean "transcending suede." Rather, through an intellectual process, the consumer determines that the attributes of ULTRASUEDE transcend or go beyond those of suede. ULTRASUEDE therefore suggests a suede-like product, and best fits into the suggestive category.

▬▬▬ ULTRASUEDE, as a suggestive term, is a valid trademark. A secondary meaning or acquired distinctiveness can further strengthen a suggestive mark, however. *Information Clearing House, Inc. v.*

Find Magazine, supra,* 492 F.Supp. at 157. Springs Mills has presented testimonial and documentary evidence demonstrating the widespread exposure of ULTRASUEDE to the public. Although Springs Mills has not expended extensive amounts relative to sales in advertising ULTRASUEDE, manufacturers and retailers selling ULTRASUEDE garments have aggressively promoted the fabric, and the mark has benefited enormously from this free publicity. *See Scarves By Vera v. Todo Imports Ltd. (Inc.),* 544 F.2d 1167, 1173 (2d Cir. 1976). The manufacturers and retailers promote the mark because of its popularity and because the mark sells their garments. The court concludes that ULTRASUEDE is a strong mark and entitled to broad protection.

(2) The degree of similarity between the marks

▬▬▬ In assessing similarity, the court evaluates the marks as viewed by likely purchasers considering the marks as entire units. *National Automobile Club v. National Auto Club, Inc.,* 365 F.Supp. 879, 883 (S.D.N.Y.1973), *aff'd without opinion,* 502 F.2d 1162 (2d Cir. 1974). Springs Mills argues the marks are essentially identical because the use of the term ULTRA evokes the same association with respect to the generic names of two luxury fabrics. In essence, Springs Mills contends that ownership of the trademark ULTRASUEDE entitles it to a monopoly on the use of ULTRA in combination with the generic names of all "luxury fabrics." However, plaintiff's argument misses the mark. ULTRASUEDE is viewed as a whole and is distinct from the component terms "ultra" and "suede," each of which is intrinsically weak.[15] ULTRASUEDE connotes a suede-

---

**13.** An example of an arbitrary term is "V–8" used for vegetable juice. *See Standard Brands, Inc. v. Smidler,* 151 F.2d 34 (2 Cir. 1945).

**14.** An example of a fanciful term is "Polaroid," *see Polaroid Corp. v. Polaraid, Inc.,* 319 F.2d 830 (7th Cir. 1963).

**15.** "Suede" is a generic term and cannot be registered as a trademark. Nor is "ultra," by itself, entitled to protection. *See Supreme Wine Co. v. American Distilling Co.,* 310 F.2d 888, 889 (2 Cir. 1962) ("Merely laudatory

words, such as 'best', 'outstanding', or 'supreme' cannot of their own force indicate the source or origin of the labeled goods."). "Ultra" similarly is a laudatory word and is intrinsically weak.

The court, in *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403, 410 (S.D.N.Y.1974), was confronted with a similar situation. The plaintiff, owner of two trademarks, "Exquisite" and "Exquisite Form", only claimed infringement of the "Exquisite" mark. The court found no infringement:

like fabric whereas ULTRACASHMERE connotes a cashmere-like fabric. A typical purchaser would not be confused by the sound or appearance of ULTRACASH-MERE and ULTRASUEDE. *See* 3 Callmann, *Unfair Competition, Trademarks and Monopolies* § 82.1(a), at 601–09 (3d ed. 1969).

■ The setting in which the trademarks are presented is also relevant to the question of similarity. *McGregor-Doniger Inc. v. Drizzle, Inc., supra,* 599 F.2d at 1133. In many respects the parties use the marks similarly. Both parties display their trademarks on garment labels and tags. UHL displayed ULTRACASHMERE on its original hang tag in a logo and typeface similar to Springs Mills' original ULTRASUEDE tags. On the back of its original hang tag, UHL described its product as "more like cashmere than cashmere itself" while Springs Mills used "more like suede than suede itself." Both parties' original tags contained virtually identical washing instructions.[16] All tags of both parties refer to polyurethane as a component.[17]

In 1980, Springs Mills redesigned its hang tags. The dominant color of the new ULTRASUEDE tags is silver, and the slogan "more like suede than suede itself" no longer appears. Shortly thereafter in 1980, UHL also redesigned its hang tags. The ULTRACASHMERE hang tags, like the ULTRASUEDE tags, are predominantly silver. UHL also deleted the slogan "More like cashmere than cashmere itself."

However, the new hang tags are different in several important respects. The latest ULTRASUEDE hang tag has an oval shape while the ULTRACASHMERE tag is rectangular. The ULTRASUEDE hang tag is also considerably larger than the ULTRACASHMERE tag. On the front side of the current tags, Springs Mills displays "ULTRASUEDE" on a single line in a narrow typeface. UHL, on the other hand, still uses the split logo and wide typeface for ULTRACASHMERE.

The reverse sides of the current tags also differ. The trademarks displayed at the top of the tags, although in a split logo, are in different typeface. ULTRACASHMERE's hang tag now recommends dry cleaning in its care instructions. The fabric descriptions are also different.[18] Unlike the original hang tags of the parties, the current hang tags are different in size, appearance, style and content.

The most important distinguishing feature present in all of the tags, new and old, of both parties is the identification of the fabric's manufacturer or distributor. The ULTRASUEDE hang tags identify the fabric as a Skinner product of Springs Mills, and the ULTRACASHMERE hang tags identify the garments as Ultracashmere House, Ltd. products. *See B & L Sales Associates v. H. Daroff & Sons, Inc.,* 421 F.2d 352, 353 (2d Cir.), *cert. denied,* 398 U.S. 952, 90 S.Ct. 1873, 26 L.Ed.2d 292 (1970). After considering the setting in which the marks are presented in addition to the apparent differences in the marks themselves, the court concludes that the marks differ significantly.

I do not think it can be seriously disputed that plaintiff's mark is intrinsically weak. It should be noted at the outset that plaintiff only claims infringement of its "Exquisite" trademark . . .; its complaint makes no mention of its "Exquisite Form" mark . . . . Hence my sole focus here is necessarily on the strength of the word "Exquisite," not of "Exquisite Form". "Exquisite", it would seem, fits readily into the category of so-called laudatory words that have not been given extensive protection against infringement in our Court of Appeals.

Thus, in the present case, the protection plaintiff seeks must stem from the entire term ULTRASUEDE, and not from the term's subparts.

16. UHL, on its original hang tag, recommended laundering by washing machine even though, as established at trial, following the recommendation would result in shrinkage of the fabric.

17. UHL listed polyurethane as an ingredient even though ULTRACASHMERE in fact is composed of 100% rayon.

18. UHL, on the tag it intends to distribute, inserted "superior spun raion" (*sic*) in the fabric description. This identification further distinguishes the products.

### (3) *The proximity of the products*

Product proximity is determined by an analysis of the involved products with respect to their attributes, functions and relative positions in the market place. *See Vitarroz v. Borden, Inc., supra,* 644 F.2d at 967; *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London, supra,* 378 F.Supp. at 411–12. The court, in its selection of the *Polaroid* factors as the basis of analysis, found that ULTRASUEDE and ULTRACASHMERE are different products. Indeed, Mr. Gossett, president of Springs Mills' Retail Fabrics and Specialty Sales Division, testified that the two fabrics do not resemble each other, and that one looking at the two fabrics would not be confused "as to the identical origin. . . ." ULTRASUEDE is a molded suede-like fabric whereas ULTRACASHMERE is a woven cashmere-like fabric. The court finds that the products differ in appearance, feel and style, and that a customer shopping for a suede-like garment would not mistakenly purchase an ULTRACASHMERE garment.

Because the products are different, proximity becomes "relevant here primarily insofar as it bears on the likelihood that customers may be confused as to the *source* of the products, rather than as to the products themselves, and the concern is not direct diversion of purchasers but indirect harm through loss of goodwill or tarnishment of reputation." *McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1134–35. If the products are more proximate, a consumer would more likely think that the same manufacturer made both products.

Here, both ULTRASUEDE and ULTRACASHMERE are high-priced man-made "luxury fabrics" used primarily in the manufacture of womens' garments. Both fabrics are eventually sold to garment consumers and also to purchasers of yard goods. A consumer shopping for an expensive garment or fabric may come across both ULTRASUEDE and ULTRACASHMERE.[19] Further, it may be assumed that consumers are aware that many fabric manufacturers have several lines of fabric.[20] Thus, an ordinarily prudent purchaser may think that the same company manufactures both ULTRASUEDE and ULTRACASHMERE. After considering the products themselves and their markets, the court concludes that the competitive distance between the products is moderate.

### (4) *Bridging the gap*

"Bridging the gap" refers to a senior user's likelihood of expansion, using the trademark, into the junior user's product field. It is unlikely that Springs Mills will attempt to enter the man-made cashmere market with the trademark ULTRASUEDE. The mark ULTRASUEDE identifies a suede-like product, and the use of this name with other fabrics is unlikely.

Nor did Springs Mills present evidence that it intends to enter the man-made cashmere field with the mark ULTRACASHMERE.[21] Absence of intent to bridge the gap is not determinative. *See McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1136. However, the lack of intent here does militate against a finding of infringement.

### (5) *Quality of defendant's product*

ULTRASUEDE is a widely known high quality luxury fabric. Springs Mills con-

**19.** Mr. March, Director of Quality Control of a division of Springs Mills testified that when he purchased an ULTRACASHMERE skirt for testing purposes, ULTRASUEDE garments were displayed on a rack in close proximity to the ULTRACASHMERE garments.

**20.** In fact, Springs Mills sells a wide variety of fabrics.

**21.** Although Springs Mills markets a wide variety of fabrics, the only fabrics for which Springs Mills owns registrations containing the prefix "ultra" are ULTRASUEDE and ULTRA-

COTTON. There are also several third party registrations containing the prefix "ultra" for apparel. However, the existence of third party registrations is not "evidence of what happens in the market place or that customers are familiar with their use." *Scarves By Vera, Inc. v. Todo Imports Ltd. (Inc.),* 544 F.2d 1167, 1173 (2d Cir. 1976), *quoting, Lilly Pulitzer, Inc. v. Lilli Ann Corp.,* 376 F.2d 324, 325 (Cust. & Pat.App.1967). Thus, the court is not to rely on these other registrations, without more, in determining the scope of protection.

tends that its reputation will be tarnished if dissatisfied ULTRACASHMERE consumers associate ULTRACASHMERE with UL-TRASUEDE. Springs Mills argues that ULTRACASHMERE, although not a poor quality fabric, is a common rayon flannel and does not possess the "miracle" attributes of ULTRASUEDE.

ULTRASUEDE's "miracle" attributes are machine washability and durability. ULTRACASHMERE, in contrast, will shrink if machine washed. Springs Mills contends that a consumer who purchased ULTRACASHMERE and followed UHL's washing instructions might be dissatisfied with the product because of shrinkage. Although the washing instructions on UHL's original ULTRACASHMERE hang tag were conceivably a source of customer dissatisfaction, Springs Mills presented absolutely no evidence of customer dissatisfaction with ULTRACASHMERE resulting from following the washing instructions.[22] Further, UHL changed the care instructions in 1980 to recommend dry cleaning. Thus, shrinkage of ULTRACASHMERE is no longer even a source of potential customer dissatisfaction.

Springs Mills also argues that customers who expect that ULTRACASHMERE will be as durable as ULTRASUEDE may be disappointed. However, ULTRACASHMERE is a cashmere-like fabric whereas ULTRASUEDE is a suede-like fabric. Cashmere's desirability derives from its qualities of warmth, luxuriousness and softness. Customers do not expect a cashmere-like product to be durable. Further, Springs Mills presented no evidence of customer dissatisfaction with ULTRACASHMERE because of durability.[23]

The court finds that ULTRACASHMERE, like ULTRASUEDE, is a high priced, high quality material. Mr. Marsh of Springs Mills testified that ULTRACASHMERE is a "lovely cloth." There was no

evidence of customer dissatisfaction with ULTRACASHMERE garments due to any source.

### (6) Defendant's good faith

Mr. Bart Schwartz, president of UHL and an individual defendant in this action, testified that when he selected the ULTRACASHMERE trademark and designed the ULTRACASHMERE hang tag he was aware of Springs Mills' ULTRASUEDE trademark and hang tag, that he always knew that ULTRACASHMERE fabric was 100% rayon and contained no polyurethane, and that he put polyurethane on UHL's tag only because it was "fashionable." Mr. Schwartz, in designing the original ULTRACASHMERE hang tag, also copied the "more like ..." slogan used in the ULTRASUEDE hang tag, and mimicked ULTRASUEDE's washing instructions.

It is clear from the record that defendants chose the ULTRACASHMERE trademark and designed the ULTRACASHMERE hang tag with the ULTRASUEDE trademark and hang tag in mind. However, that alone does not answer the inquiry into the good faith and state of mind of the defendant. As Judge Weinfeld stated in *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1230 (S.D.N.Y. 1977), aff'd, 580 F.2d 44 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979), "[t]he fact that one believes he has a right to adopt a mark already in use because in his view no conflict exists since the products are separate and distinct cannot, by itself, stamp his conduct as in bad faith ...." Thus, although defendants were almost certainly inspired by Springs Mills' ULTRASUEDE mark, and in fact copied many elements of ULTRASUEDE's trade dress, they did not necessarily act in bad faith. Considering the differences between the products and marks con-

---

**22.** Springs Mills introduced laboratory test results to demonstrate shrinkage. Plaintiff did not call an ULTRACASHMERE consumer as a witness on this or any other issue.

**23.** Springs Mills established during trial that contrary to the fiber content stated on the UL-

TRACASHMERE hang tags, ULTRACASHMERE in fact contains no polyurethane. However, again plaintiff offered no proof that this statement resulted in any consumer dissatisfaction.

tested here, the court finds that defendants did not act in bad faith in selecting the trademark ULTRACASHMERE.[24] This is not to say the court sanctions the conduct of defendants, particularly their misrepresentation of attributes of ULTRACASHMERE.

#### (7) *Actual confusion*

■ Springs Mills sought to demonstrate actual confusion by introducing evidence of four telephone calls and one letter from "confused" customers to Springs Mills. In the telephone communications, customers inquired about ULTRACASHMERE fabric. In the letter, a customer inquired as to whether Springs Mills manufactures ULTRACASHMERE.

These isolated inquiries do not compel a conclusion that there was actual confusion. In none of the inquiries did a customer actually attempt to order ULTRACASHMERE from Springs Mills. Rather, the customers inquired as to the identity of the manufacturer of ULTRACASHMERE. Further, Springs Mills did not call any of these customers to testify as to the circumstances of these phone calls and letter or as to confusion. Springs Mills' employees who

actually received the calls likewise did not testify.[25] The four calls and letter show, if anything, the absence rather than existence of actual confusion.

■ Springs Mills also introduced newspaper and magazine articles and advertisements to support a finding of actual confusion. Several of the advertisements promoted both ULTRASUEDE and ULTRACASHMERE. Other articles and advertisements promoted ULTRACASHMERE as being composed of polyurethane and noted, in addition, that polyurethane is a component of ULTRASUEDE. These articles and advertisements do not create any confusion as to source between ULTRACASHMERE and ULTRASUEDE. The articles and advertisements do not suggest that the two fabrics are made by the same manufacturer. The potential association of source due to ULTRACASHMERE's polyurethane representation in these advertisements and articles is at best attenuated.

■ Springs Mills also introduced into evidence one trade magazine advertisement placed by a third party promoting a booth at a trade show. The advertisement stated that ULTRACASHMERE is made by the

---

**24.** The intent factor raises a difficult problem. In a case such as this, where the marks and products are different, the court's determination of good faith rests in large part on whether the court finds the junior user justified in his selection and use of a particular trademark. In other words, the court must determine whether the junior user, who decided he could use a particular trademark, had a valid basis in trademark law for that decision. The court, in effect, is evaluating defendant's evaluation of the law. However, the determination of whether the law permits the junior user to use the mark is made by an analysis of the *Polaroid* factors, one of which is the good faith of the junior user. Thus, there is an element of circularity in the determination of good faith.

This problem of circularity can be avoided by adoption of the "two-stage" analysis under which the court first considers the *Polaroid* factors relevant to the likelihood of confusion, and only considers the junior user's good faith if a likelihood of confusion is found. *See* note 9 *supra*. However, adoption of a test that does not consider intent as an element of the likelihood of confusion would be inconsistent with several opinions of the Second Circuit. *See e.g. Maternally Yours, Inc. v. Your Maternity*

*Shop, Inc.*, 234 F.2d 538, 543 (2d Cir. 1956) (Although not determinative, "[a]n intent on the part of an alleged infringer to palm off his products as those of another, is, of course, a relevant factor in determining the likelihood of consumer confusion.").

**25.** Springs Mills did not call a single customer to testify as to actual confusion. Nor did plaintiff present to the court the results of a survey or other means of establishing the extent of consumer confusion. The court finds that these omissions of proof are significant. As Judge Weinfeld, confronted with a similar lack of proof, remarked:

> Not a single salesperson or retailer was called to testify as to confusion on his or her part or that he or she knew of a single instance of consumer confusion. This omission is underscored by the fact that defendant is a substantial corporation with the means to have undertaken either a survey or an investigation to establish instances of actual consumer confusion.

*Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1231 (S.D.N.Y.1977), *aff'd*, 580 F.2d 44 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1032, 59 L.Ed.2d 75 (1979).

makers of ULTRASUEDE. It is unclear whether even this advertisement resulted in any confusion. Springs Mills offered no evidence as to the circumstances surrounding the advertisement. Thus, the court is unable to ascertain whether the advertiser knew the products were manufactured by two separate companies, who the readers of the advertisement were, or even what relationship the advertiser had with defendants. *See Mushroom Makers, Inc. v. R. G. Barry Corp., supra*, 441 F.Supp. at 1232 (failure to offer evidence as to circumstances surrounding advertisements). After reviewing all the evidence offered to show actual confusion, the court finds unpersuasive Springs Mills' showing on this issue.[26]

(8) Sophistication of the Buyers.

Springs Mills sells ULTRASUEDE to garment manufacturers and to retailers of yard goods. Certainly, the garment manufacturers and retailers who purchase ULTRASUEDE possess a high level of sophistication. The ultimate consumer, whether a purchaser of a garment or over-the-counter yard goods, can also be expected to be knowledgeable, in light of the high quality and price of ULTRASUEDE. *See McGregor-Doniger Inc. v. Drizzle Inc., supra*, 599 F.2d at 1137 ("The greater the value of an article the more careful the typical consumer can be expected to be . . . ."). Defendant likewise manufactures an expensive, high quality fabric and ULTRACASHMERE purchasers likewise can be expected to be careful. Springs Mills has offered no evidence establishing that a significant number of ULTRASUEDE or ULTRACASHMERE customers are casual or unsophisticated. *See Omega Imposting Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971); *Harold F. Richie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 761 (2d Cir. 1960). This factor therefore weighs against a finding of a likelihood of confusion.

\*      \*      \*

■ The Second Circuit has repeatedly noted that the question of trademark pro-

tection on non-competing products "does not become easier of solution with the years." *McGregor-Doniger Inc. v. Drizzle Inc., supra*, 599 F.2d at 1130, *quoting, Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). This case is no exception. While some of the *Polaroid* factors favor Springs Mills, others favor UHL. In considering and weighing the factors, this court finds that Springs Mills has not sustained its burden of proving a likelihood of confusion. An "appreciable" number of customers are not likely to be misled as to the source of the goods.

The marks ULTRASUEDE and ULTRACASHMERE are different in sound, appearance and suggestion, and the hang tags supplied by the parties identify the manufacturer of the fabric. In both appearance and feel, ULTRASUEDE and ULTRACASHMERE are easily recognizable as different fabrics. Springs Mills' evidence of actual confusion was minimal.

Ultimately, a finding here for Springs Mills would grant it exclusive use of "ULTRA" in conjunction with the generic names of luxury fabrics. Such a result would not be in the public interest. *See Miss Universe, Inc. v. Patricelli*, 408 F.2d 506, 511 (2d Cir. 1969) ("The right to which appellee is entitled is that of being protected against encroachments on its registered marks, not of having the aid of a decree to create or support an enlarged monopoly."). Although ULTRASUEDE is a strong mark and entitled to broad protection, it is not entitled to the breadth of protection Springs Mills seeks here. The failure to show a likelihood of confusion tips the scale in favor of the use of the different marks for the different products involved in this case.

### B.    Section 1125(a)    False Association and Description

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), makes actionable the use of a false designation of origin or

---

**26.** The failure to show actual consumer confusion is not determinative, as such proof may be difficult to obtain. See *Affiliated Hospital Products., Inc. v. Merdel Game Manufacturing Co.*, 513 F.2d 1183, 1188 (2d Cir. 1975).

any false description of one's product.[27] The statute is broader than § 1114(1), the trademark infringement section, in that it covers false advertising or description whether or not it involves trademark infringement. *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London, supra,* 378 F.Supp. at 413. Section 1125(a) creates a federal cause of action for unfair competition, and is to be broadly construed. *See Pic Design Corp. v. Sterling Precision Corp.,* 231 F.Supp. 106, 114 (S.D.N.Y.1964); *CBS Inc. v. Springboard International Records,* 429 F.Supp. 563, 566 (S.D.N.Y.1976). However, the focus of Section 1125(a) is on the commercial rather than consumer ramifications of the alleged conduct. In order for a false description or designation to be actionable, the plaintiff must expect a commercial or competitive injury. *See Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686, 692 (2d Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971) (denying a right of action to consumers under Section 1125(a)).[28]

■ There are two bases for liability under Section 1125(a): false description and false association. *See Societe Comptoir De L'Industrie v. Alexander's Department Stores, Inc.,* 299 F.2d 33, 36 (2d Cir. 1962).

The false association, or sponsorship, theory is much the same under Section 1125(a) as under Section 1114(1). The plaintiff must prove that "the defendant's goods are likely to be thought to have originated with, or to have been sponsored by, the true owner of the mark." *Id.* And, as noted by the court in *Exquisite Form,* the "plaintiff has no easier a burden under § 43(a) [1125(a)] than under § 32(1) [1114(1)]; he must still demonstrate a likelihood of consumer confusion." *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London, supra,* 378 F.Supp. at 414.

■ This court, in determining the likelihood of confusion under Section 1114(1), the trademark infringement cause of action, considered not only the contested trademarks, but also the setting in which the parties use the marks. Thus, the same analysis that led the court to conclude that Springs Mills failed to demonstrate a likelihood of consumer confusion as to source under Section 1114(1), leads the court to conclude that, under Section 1125(a) as well, there is no likelihood of confusion. *See id.* at 413.[29]

■ A basis of liability under Section 1125(a), distinct from the sponsorship theory discussed above, is the false advertising or description of a product. Under this theory, allegedly inaccurate advertising or description provides a competitor with an inappropriate advantage. *See e.g. American Home Products Corp. v. Johnson & Johnson,* 577 F.2d 160 (2d Cir. 1978). The question is not confusion of source, but confusion as to a competing product's attributes. In order to have standing under this theory, the plaintiff's product must be in competition with the product which is false-

27. Section 1125(a) provides:
Any person who shall affix, apply, or annex, or use in connection with any goods or services . . . a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same . . . shall be liable to a civil action . . . by any person who believes that he is or likely to be damaged by the use of any such false description or representation.

28. In *Colligan,* the Second Circuit stated:
. . . Congress' purpose in enacting § 43(a) was to create a special and limited unfair competition remedy, virtually without regard for the interests of consumers generally and almost certainly without any consideration of consumer rights of action in particular. The Act's purpose, as defined in § 45, is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct.
442 F.2d at 692. The protected class under the Lanham Act is limited to "commercial, though not necessarily competitive, plaintiffs." *Id.*

29. Springs Mills' failure to meet the standard of Section 1125(a) disposes of any claim under the common law of unfair competition. *See B. D. Communications, Inc. v. Dial Media, Inc.,* 429 F.Supp. 1011, 1014 n.4 (S.D.N.Y.1977); *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London, supra,* 378 F.Supp. at 415; *Sears, Roebuck & Co. v. Allstate Driving School, Inc.,* 301 F.Supp. 4, 19 (E.D.N.Y.1969); *Dell Publishing Co. v. Stanley Publications, Inc.,* 9 N.Y.2d 126, 211 N.Y.S.2d 393, 172 N.E.2d 656 (1961).

ly advertised or described. Without competition, there would be no commercial injury and the plaintiff would lack standing under *Colligan.*

■■■ Defendants admitted at trial that several representations on the ULTRACASHMERE hang tags are false.[30] There is no polyurethane in ULTRACASHMERE and no industry recognized fiber termed "Multiple Fibre MPX–14." However, Springs Mills has not demonstrated with respect to these representations that it will suffer any competitive or commercial injury. Sales of ULTRASUEDE will not likely be diverted due to false descriptions of ULTRACASHMERE. Springs Mills lacks standing to press these claims under Section 1125(a).

### C. New York General Business Law § 368–d[31]

■■■ Section 368–d is New York's "anti-dilution" statute. The purpose of this section is the "prevention of trade-mark or trade name dilution . . . ." *Allied Maintenance v. Allied Mechanical Trades,* 42 N.Y.2d 538, 542, 399 N.Y.S.2d 628, 630, 369 N.E.2d 1162, 1164 (1977). Dilution is the adverse effect upon the value of a senior user's mark resulting from a junior user's continuing use of a similar mark. *See King Research, Inc. v. Shulton, Inc.,* 324 F.Supp.

631, 638 (E.D.N.Y.1971), *aff'd.,* 454 F.2d 66 (2d Cir. 1972).

In *Allied Maintenance, supra,* the New York Court of Appeals stated that it was not necessary to prove confusion between the marks in order to prevail under Section 368–d. However, the Second Circuit has characterized this statement as dictum and "contrary to the weight of state and federal authority . . . ." *Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 49; *see Information Clearing House v. Find Magazine, supra,* 492 F.Supp. at 162 n.44. If confusion is the standard, as stated by the Court of Appeals for this Circuit, Springs Mills has not met its burden.

■■■ In some New York cases, a finding that the defendant intentionally selected the name in order to trade on the plaintiffs' reputation was found to be sufficient without proof of confusion. *See Allied Maintenance v. Allied Mechanical Trades, supra,* 42 N.Y.2d at 543–46, 399 N.Y.S.2d at 631–32, 396 N.E.2d at 1163–64; *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London, supra,* 378 F.Supp. at 414–15. Considering the difference between the trademarks ULTRASUEDE and ULTRACASHMERE, and the court's previous evaluation of UHL's intent in its discussion of the *Polaroid* factors, the court finds that Springs Mills has not met this test as well.

---

**30.** Defendants admitted at trial and in their papers that all of the ULTRACASHMERE hang tags are in violation of the Textile Fiber Products Identification Act, 15 U.S.C. § 70 et seq. See Defendants' Post Trial Brief at 16 ("Defendants have admitted that they are in violation of the Textile Fiber Products Identification Act."). The Textiles Fiber Products Identification Act, 15 U.S.C. § 70a(a) provides in part:

The introduction, delivery for introduction, manufacture for introduction, sale, advertising, or offering for sale, in commerce, . . . of any textile fiber product which is misbranded or falsely or deceptively advertised . . ., is unlawful, and shall be an unfair method of competition and an unfair and deceptive act or practice in commerce under the Federal Trade Commission Act.

The Act provides administrative remedies and criminal penalties for violations.

An action between private parties under the Lanham Act is not the proper forum for enforc-

ing the Textiles Fiber Products Identification Act. *See American Home Products Corp. v. Johnson & Johnson,* 436 F.Supp. 785, 797 (S.D. N.Y.1977), *aff'd,* 577 F.2d 160 (2d Cir. 1978) ("an action under the Lanham Act and state unfair competition laws is not the proper legal vehicle in which to vindicate the public's interest in health and safety."); *see also* 15 U.S.C. § 70e. The court therefore will not examine violations of the Textiles Fiber Products Identification Act.

**31.** Section 368–d provides:

Likelihood of injury to business reputation or . of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

## CONCLUSION

Plaintiff has failed to sustain its burden with respect to any of its causes of action.[32] Accordingly, defendants are entitled to judgment on the merits. Defendants' counterclaim is dismissed.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

---

**32.** Springs Mills argues that individual defendant Bart Schwartz should be held liable insofar as he did not put on a defense. However, plaintiff has failed to sustain its burden of proof with respect to Mr. Schwartz as well as UHL for the reasons stated above regardless of any defenses to the action Mr. Schwartz may have.